BERGER BROS. ELECTRIC MOTORS, INC., Plaintiff, *v.* NEW AMSTERDAM CASUALTY COMPANY, Defendant.

Supreme Court, Oswego County, September 15, 1942.

*Culkin & Amdursky* [*Leroy Hodge* of counsel], for the plaintiff.
*Reilly, Roberts, McLouth & Dicker,* for the defendant.

KIMBALL, J. The action is upon two public liability policies issued by the defendant to the plaintiff. The case has been submitted to the court for decision upon an agreed state of facts.

The Central New York Power Corporation, which furnished electrical energy in the county of Oswego, having determined to substitute energy of a frequency of sixty cycles for energy of twenty-five cycles, contracted with the plaintiff, an electrical contracting company, to make the change-over of the equipment used by its customers. Among the customers was one George F. Chillson, the operator of a large commercial turkey farm. Chillson employed on his farm three incubator hatchers operated by electricity. Pursuant to its contract with the Central New York Power Corporation, the plaintiff, between November 18, 1940, and December 23, 1940, removed Chillson's old motors and installed new ones. It also placed impeller blades or fans on the shafts, which were driven by the motors and which caused the air to circulate in the hatcher incubators. Having ostensibly completed its work, the plaintiff was paid in full by the Power Corporation.

The incubators were not used until February 20, 1941, at which time and continuing until April 25, 1941, Chillson set hatches of eggs, totalling 17,000 eggs. Some of them proved infertile, some failed to hatch, some which did hatch died within a few days, and those which lived suffered a retarded growth and diminution in size. The cause of this unfortunate result was that the motors were so installed by the plaintiff as to cause the impeller blades to rotate in the wrong direction. The blades controlled the air flow or air currents in the incubators. The reversed direction of the fans resulted in an improper circulation of air currents and improper temperature and humidity. It is stipulated "that the negligent acts of the plaintiff's employees in so installing the motors so that the fans ran in a reversed rotation were the sole cause of the failure of the above-described number of turkey eggs to hatch, of the death of the number of turkeys that died soon after hatching, and of the diminution in size of the turkeys that survived."

On May 2, 1941, Chillson discovered that his fans were operating in the wrong direction. He notified the Central New York Power Corporation on May 3, 1941, and it, in turn, notified the plaintiff, whose employees then corrected the rotation of the fans. Chillson brought suit against the Central New York Power Corporation and this plaintiff for damages. The plaintiff gave notice to this defendant of the facts on May 12, 1941. The defendant disclaimed any liability under its contracts of insurance and refused and failed to investigate or defend the action. Thereafter the action brought by Chillson was settled. The plaintiff paid him $5,750. The

plaintiff's legal and other expenses amounted to $1,912.01, and the plaintiff now demands judgment against the defendant for $7,662.01.

The first policy issued to the plaintiff covered the period from March 6, 1940, to March 6, 1941. This policy covered the plaintiff " as respects bodily injuries or death suffered, or alleged to have been suffered, as the result of any accident occurring while this policy is in force  *  *  *." An endorsement thereon provided " that the Policy to which this Endorsement is attached is extended to cover loss from the liability imposed by law upon the Assured for damages on account of injury to or destruction of property  *  *  * resulting solely and directly from any accident due to or caused by the operations specifically set forth in the Schedule of this Endorsement and at the places mentioned therein, provided such damage or destruction is caused as a result of accidents occurring while this Endorsement is in force."

The second or renewal policy covered the period from March 6, 1941, to March 6, 1942. The property damage endorsement states " the policy is extended to cover loss by reason of the liability imposed upon the insured by law for damages because of injury to or destruction of property, including the loss of use thereof, caused by accident and arising out of the operations specifically set forth in this endorsement and at the locations stated herein."

Inasmuch as the liability of the plaintiff to Chillson is conceded, there is presented the question whether, under the terms of the policy contracts, the plaintiff was insured against the hazard presented by the facts. The defendant denies there · was any accident. If there was no accident within the meaning of the policy provisions it is immaterial whether the work had been completed or whether the plaintiff settled with Chillson without the written consent of the defendant.

If the plaintiff is to recover it must be because the injury to or destruction of the turkey eggs was the result of or was caused by accident. The policy contracts so state, without question or ambiguity. What was intended by the parties to the contract by the use of the word " accident ? "  " Accident " has been defined many times. (1 C. J. S. p. 425.) It is an occurrence or event that takes place without one's foresight or expectation; an undesigned, sudden and unexpected event; a casualty or mishap. In construing a contract involving the word " accident," its meaning must not be a technical or scientific or strictly legal meaning, but rather the meaning which would be given to it by the average man; the meaning to be conveyed to another by the common speech of men. (*Lewis* v. *Ocean Accident & Guarantee Corp.*, 224 N. Y. 18.)

An accident is an event referable to a determinate or single act; identified in time and space; it is an event or happening which is fortuitous and catastrophic. The word conveys the meaning of a sudden and instant happening rather than a condition which develops and progresses. (*Jackson* v. *Employers' Liability Assurance Corp.*, 139 Misc. 686; affd., 234 App. Div. 893; affd., 259 N. Y. 559, and authorities there cited.)

I think that no person could successfully argue that there was an accident in December, 1940, when the motors were changed and the impeller blades adjusted. True it is that the plaintiff's employees were careless and negligent. They failed to follow the terms and specifications of the plaintiff's contract with the Power Corporation. Their workmanship was defective and the installation carelessly made. However, nothing happened then. No accident occurred. The machinery was dormant. There was no unexpected and sudden event identifiable in time or space. There was careless workmanship, but nothing more. The defendant did not insure the plaintiff for its mere careless workmanship, but only if such carelessness caused an accident which resulted in injury or destruction of property. In principle, the case of *American Forests Products Co., Inc.*, v. *Lumbermen's Mutual Cas. Co.* (235 App. Div. 458) is in point. There the plaintiff's employees negligently loaded poles on a car. The policy covered accidents at the place of loading. A man was killed by the rolling of the poles from the car at the place of unloading. The court held that the accident happened at the place of unloading, although the negligence of the plaintiff's employees took place where the car was loaded. Unless this were the rule there would be no limitation of liability for accidents either as to time or place. A contrary construction would mean that if there was negligence while the policy was in effect the insurer would be liable for an accident whenever and wherever thereafter occurring. Such result clearly was not within the contemplation of the parties to the policies in question. If there was an accident in the instant case it did not take place when the motors were installed. (See, also, *Tulare County Power Co.* v. *Pacific Surety Co.*, 43 Cal. App. 315; *Farmers Cooperative Soc. No. 1 of Quanah* v. *Maryland Casualty Co.* [Tex. Civ. App.], 135 S. W. [2d] 1033; *Deer & Son* v. *Employers Indemnity Corp.*, 77 F. [2d] 175; *Loveman, Joseph & Loeb* v. *New Amsterdam Casualty Co.*, 233 Ala. 518; *McKeesport City* v. *Standard Surety and Casualty Co. of N. Y.*, 326 Pa. 167.)

The plaintiff contends, however, that even though it be held that there was no accident in December of 1940 there was an accident subsequently and at the time the motors were started

on February 20, 1941. This contention must be carefully examined. When the motors were started the impeller blades were caused to rotate in reversed direction. This reversal of direction was the result of the careless and negligent installation. The reversed direction of the blades caused certain conditions to exist in the incubator. Such conditions were detrimental to the successful and proper and normal development of the turkey eggs. For a statement of the changed conditions and the effects of the reversed rotation we may rely on two letters from an expert in poultry husbandry, which are in evidence. Professor Romanoff states that the reversed rotation caused environmental changes in the incubator (a) increasing the air circulation in the incubating compartment, with an increase in temperature and decrease in humidity, and (b) leaving the hatchery compartment without the supply of fresh air and impairing the control of both temperature and humidity. He states: " From these observations it is evident that, with the reversal in rotation of impeller blades, some unfavorable conditions would be created in the incubator compartment, but the greatest damage would be done to turkey eggs in the hatchery compartment. * * * the lack of ventilation in the hatching compartment will change the conditions to a very unfavorable direction. * * * Under such unfavorable conditions the vital formative processes of the embryo can be seriously disturbed and may be permanently impaired. My experiments at Cornell show that turkey eggs are especially sensitive to slight changes in environmental conditions. * * * In conclusion I may state that the reversal in rotation of impeller blades in a Jamesway electric incubator, of the type used on the Chillson's Turkey Farm, would change the environmental conditions in such a way that it would interfere with the normal development of the turkey eggs." Again he says: " The main thesis of the case would have to rely on the fact that close interrelationship among various environmental factors exists in the incubator. That is, the disturbance of any one of these factors in the incubator would invariably put out of balance the other factors, thus creating a new set of conditions."

It is my opinion that there was no accident either at the time the motors were started or thereafter within the meaning of the word " accident," as used in the policies and as understood by the average man. A condition was caused to exist which, as the expert states, " would interfere with the normal development of the turkey eggs." Professor Romanoff speaks of no accident, but only a change in environmental conditions. There was no sudden happening which caused injury or damage to the eggs, but, on the other hand, a condition was set up which continued to develop, progress and

change through a period of time. It cannot be said that the injury occurred to the eggs on February 20, 1941, or a week later or a month later. There was no event which can be identified in time at all. Due to improper circulation of air there was an abnormal or subnormal development of the embryos. This failure in normal growth and development was progressive over the period of incubation. The normal development of the eggs was interfered with. Environmental conditions were rendered nonconducive and unfavorable to normal growth. The normal growth and development of the eggs were impeded and interfered with, not by accident, but by certain environmental conditions brought into play by the negligent installation of the motors.

To my mind the decision in *Jackson* v. *Employers' Liability Assurance Corp.* (*supra*) is directly in point and is controlling. There the plaintiff landlord had had judgment against him for negligently permitting the leased premises to be in an unheated, cold, damp, unsafe and unhealthful condition. As a result of the environmental condition, caused by or permitted to exist by the landlord, a child became ill " as the result of exposure and chilling of the body surfaces " and finally died. It was held that the landlord could not recover upon his policy as there was no accident. To like effect is the rule laid down in *Matter of Lamphier* v. *Air Preheater Corp.* (278 N. Y. 403). Cases such as *Lagowitz* v. *United States Fidelity & Guaranty Co.* (256 App. Div. 1087; affd., 281 N. Y. 876), *Matter of Connelly* v. *Hunt Furniture Co.* (240 N. Y. 83) and *Matter of Hocke* v. *Emdoc Management Corp.* (245 App. Div. 882; affd., 269 N. Y. 592) are not in conflict with the *Jackson* case. In each instance there was a definite accident, sudden, unexpected, identifiable in time and space, which caused a bodily ill. In none of these cases was the illness caused simply by certain unfavorable environmental conditions.

In view of my opinion that there was no accident when the motors were installed or at any time thereafter, it is unnecessary to pass upon the other points raised by counsel.

The motion of the plaintiff for judgment is denied. The motion of the defendant for judgment is granted. Findings may be settled on five days' notice.