SENN PRODUCTS CORPORATION, Plaintiff, *v.* HARTFORD STEAM BOILER INSPECTION AND INSURANCE COMPANY, Defendant.

City Court of New York, Trial Term, Queens County, March 24, 1943.

*Henry Duke* for plaintiff.

*Myles A. Walsh* for defendant.

TOWERS, J. This action was tried before the court, without a jury, and is to recover damages alleged to have been sustained as the result of an accident.

The defendant issued to plaintiff a policy of insurance, by the terms of which defendant agreed to indemnify plaintiff against loss " from an accident as herein defined to an object described herein." The term " accident " is defined in the policy as " a sudden and accidental tearing asunder of the object or any part thereof caused by the pressure of steam or water therein, or the sudden and accidental crushing inward of a cylindrical furnace or flue of the objects so caused." The " objects " insured are described in schedules attached to the

policy and, so far as material, consist of a fire-tube Economic boiler. It was in this fire-tube Economic boiler that the alleged accident is claimed to have occurred.

The boiler in question was a return tubular-steel boiler of riveted-seam construction. It consisted of a horizontal shell sixty inches in diameter projecting beyond the front riveted seam to form a smokebox. The rear part of the shell was joined by a riveted seam to a larger oval shell. The upper portion of the boiler contained a number of long rolled-steel tubes, running from the circular head in front to the rear oval head, and the lower portion of the boiler contained a number of short tubes running from the fire tube-sheet to the rear oval tube-sheet. When the boiler was in operation the tubes were surrounded by the water within the boiler, while the hot gases from the furnace passed through the tubes to heat the water, thereby generating steam. The upper part of the boiler, above the long tubes, formed a steam space, with a waterline an appropriate distance from the top of the boiler. The bottom and sides of the round portion of the boiler were exposed to the direct action of the fire, as was the fire tube-sheet. It was externally fired, through a brick furnace situated under the front portion of the round part of the boiler. The fuel used was oil, which was injected into the rear part of the brick furnace by an oil burner. In operation, the fire and hot gases would strike the bottom of the round shell and then pass through the rows of short tubes to a chamber attached to the rear end of the boiler. Here the hot gases would travel upward and thence back through the rows of long tubes in the upper part of the boiler to the smokebox in the front of the boiler, from where they were discharged into the smokestack. The boiler was equipped with a steam gage, two safety valves, a water column with gage glass and try-cocks, a blow-off pipe with a blow-off valve, a feed-inlet pipe with a valve, and a main steam pipe with a valve.

The boiler was manufactured in 1924 and was in use for the following four years. It was then out of use until 1934, at which time it was purchased by plaintiff, and thereafter was in continuous use with a normal steam pressure of about one hundred pounds per square inch until January 4, 1942. It was operated sometimes eight hours a day and in peak seasons as much as sixteen hours a day. It was designed for the production of steam for power and processing purposes. It was used by plaintiff primarily to supply steam to cooking kettles used by plaintiff in the manufacture of certain products.

At the end of the day, January 4, 1942, which was also the end of the week, the fire in the boiler was allowed to die down and go out. Nothing had happened up to this time with respect to the boiler that had attracted the attention of anyone. It had not been examined internally for at least a month and probably longer, although it was casually inspected externally several times each day. The main purpose of allowing the fire in the boiler to die down and go out was so that the boiler would cool off and permit the installation of a new oil burner which plaintiff intended to install the following Monday morning. Accordingly, arrangements were made to commence the installation of the new oil burner and at the same time, because the boiler would be cooled off and accessible, arrangements were made to have a boiler-repair mechanic make such repairs inside the boiler itself as might be needed, including the rolling of the tubes and including also the caulking of the seams if they needed it.

When the mechanics commenced their work on Monday morning, January 7, 1942, a bricklayer mechanic working in connection with installing the new oil burner called the attention of the boiler-repair mechanic to a sag in the sheet on the upper part of the interior of the boiler. The boiler-repair mechanic thereupon called the attention of plaintiff's engineer to this sag, and this was the first time plaintiff knew of the existence of the condition in the boiler which is the basis of plaintiff's contention that an accident occurred.

On inspection, the sag was found to be a bulge or distortion downward in the shell plate over the fire box, to a depth of approximately three inches, for a distance of approximately four feet in length, starting about six or eight inches from the front head-seam and for about the same distance from the fire-box tube-sheet seam. The bulge or distortion extended girth-wise for a distance of approximately six and one-half feet. In other words, the bulge or distortion did not extend to any of the seams. There was no hole, break, crack, tear or other opening in the bulge or distortion itself. There was some slight leakage or evidence of leakage at the seam itself. The extent of this leakage can probably best be visualized from the testimony of the witness Roland K. Borchers, called by plaintiff, who testified that there was a separation at the seam, and was asked: "Q. How big a separation did you see? A. Minute. Very minute. Q. How minute? A. A fraction of an inch; small fraction of an inch. Hardly perceptible. Q. Beg pardon? A. Hardly per-

ceptible. Q. Hardly perceptible to the human eye? A. That's right. Q. As a matter of fact, you would have to have a magnifying glass to see it? A. That's right."

On the inspection it was also found that there was soot over the surface of the bulge or distortion, indicating the bulge or distortion had existed for some time prior to the shutting down of the boiler.

After the inspection plaintiff was advised by defendant that it would not be safe to operate the boiler with a steam pressure of more than fifteen pounds per square inch. It was not operated again. It is quite probable that if it had been operated again there might have been an accident, but that is not decisive of the issues.

Counsel for both sides in this case have advised that there is no reported case in this State directly in point, and none has been found by the court. However, the factual situation presented in *Cleveland Drop Forge Co.* v. *Travelers' Indemnity Co.* (114 Ohio St. 549) is almost identical with the factual situation presented in the instant case. The reasoning of the court in that case is persuasive.

If the plaintiff is to recover, it must be because the proofs affirmatively establish (1) that there was an accident, and (2) that such accident was the particular type or character of occurrence the parties agreed by the terms of the policy of insurance must occur before liability would arise. It is well settled that in this type of case the burden is upon the plaintiff to establish affirmatively that the occurrence complained of was one of the risks assumed. (*Cary* v. *Home Ins. Co.*, 235 N. Y. 296; *Borgemeister* v. *Union Ins. Soc.*, 127 Misc. 9; *Green* v. *Globe & Rutgers Fire Ins. Co.*, 200 App. Div. 343.)

Whether or not the testimony in this case demonstrates that an accident did actually occur depends upon the meaning of the word " accident ". It has been given various definitions. (See 1 C. J. S., Accident, p. 425 *et seq.*) Cases decided under the provisions of the Workmen's Compensation Law and other statutes, as well as cases decided where insurance policies covering accidents were involved, may aid in determining the meaning our courts have given to the word " accident ".

In *Lewis* v. *Ocean Accident & Guarantee Corp.* (224 N. Y. 18–21), where the question was whether injuries resulting in death were effected by accidental means and within the coverage of an insurance policy, the court in discussing the meaning to be placed on the word " accidental " said: " But our point of view in fixing the meaning of this contract, must not be that of

the scientist. It must be that of the average man * * *. * * * This test — the one that is applied in the common speech of men — is also the test to be applied by courts * * *.''

In *Matter of Connelly* v. *Hunt Furniture Co.* (240 N. Y. 83–85), in discussing the meaning of '' accidental '', the court said: '' The tests to be applied are those of common understanding as revealed in common speech * * *.''

In *Jeffreys* v. *Sager Co.* (198 App. Div. 446, 447, affd. 233 N. Y. 535) it was said: '' The word ' accident ' is derived from the Latin verb *accidere,* signifying ' fall upon, befall, happen, chance ' (Century Dictionary), and denotes an event which occurs upon the instant rather than something which continues, progresses or develops.''

In *Jackson* v. *Employers' Liability Assur. Corp.* (139 Misc. 686–689, affd. 234 App. Div. 893, affd. 259 N. Y. 559), the court said: '' The word ' accident,' in the point of view of the average man, conveys a sudden and instant happening, an event of the moment rather than a condition which continues to develop, progress and change through a period of time. According to the mental conception of the average man, it means a happening, not only unexpected and unusual, but one referable to a definite and fixed period of time.''

In *Berger Bros. Electric Motors, Inc.,* v. *New Amsterdam Cas. Co.* (178 Misc. 1053–1056), in defining the word '' accident '', the court said: '' It is an occurrence or event that takes place without one's foresight or expectation; an undesigned, sudden and unexpected event; * * *. An accident is an event referable to a determinate or single act, identified in time and space; it is an event or happening which is fortuitous and catastrophic. The word conveys the meaning of a sudden and instant happening rather than a condition which develops and progresses.''

Considering the testimony in this case in the light of the foregoing decisions, I think no one could successfully argue that any accident is shown to have occurred, regardless of whether it was of the particular type or kind of occurrence required before liability arises under the policy of insurance. The testimony establishes the discovery of a condition rather than an accident. Nothing happened suddenly. The mere fact alone that a bulge or distortion is discovered in the shell plate of a boiler that has been in normal use for a great number of years, where nothing has happened up to the time of such discovery to attract the attention of anyone, and without any explanation

of when the bulge or distortion occurred — whether it occurred suddenly or was something that progressively developed into what it was — or satisfactory proof of how it occurred or what its cause was, falls far short of establishing affirmatively that an accident occurred. A finding that the bulge or distortion was the result of an accident, under such circumstances, would require the indulgence of mere speculation. The experts do not agree in their opinions as to what caused the bulge or distortion, but, even if the cause were precisely known, there is still no demonstration in this case of an event, sudden happening or occurrence referable to a determinate or single act identified in time.

Such minute separations at the seams, as shown by the proofs, are common occurrences with boilers of the type involved, due to usual expansion and contraction under normal use. Such a minute separation is not a " tearing asunder " within the plain meaning of that term as used in the policy of insurance. There was some leakage or evidence of leakage at the seam. The remedy for such separation and such leakage is caulking. It was for such very purpose, among others, that a boiler-repair mechanic was called in by plaintiff before the condition complained of was discovered. Among other repairs, he was to caulk the seams, if needed. The separation and leakage were not unexpected or shown to have occurred suddenly and, therefore, are not indicative of an accident.

In view of the conclusion reached, it is not necessary to discuss further whether the condition complained of falls within the particular risks assumed by the terms of the policy. Neither is it necessary to determine the elements of damage.

I find the plaintiff has failed to sustain the burden of proof. I direct judgment accordingly, dismissing the complaint on the merits, after trial.

Thirty days' stay; sixty days to make a case.