**GOOD CANNING COMPANY,**
Plaintiff,

v.

**LONDON GUARANTEE AND ACCI-DENT COMPANY, Ltd.,**
Defendant.

**No. 1150.**

United States District Court,
W. D. Arkansas, Fort Smith Division.
Feb. 17, 1955.

Bethell & Pearce, Fort Smith, Ark., for plaintiff.

Daily & Woods, Fort Smith, Ark., for defendant.

JOHN E. MILLER, District Judge.

On August 27, 1954, plaintiff filed its complaint against the defendant alleging that it had entered into a contract of insurance with the defendant whereby defendant insured it against loss resulting from accident to certain property owned by plaintiff, including a certain fire tube boiler; that while said policy was in full force and effect an accident occurred causing damage to the boiler in the sum of $8,630.49 (this sum was subsequently reduced to $7,615.14), and causing prevention of plaintiff's business for a length of time resulting in loss to plaintiff in the sum of $1,680.85 (this sum was subsequently raised to $1,850.48); that notice was given defendant but defendant refused to pay plaintiff as provided in the contract of insurance. Plaintiff prayed judgment for its damages, plus penalty, attorney's fee and costs.

On September 18, 1954, defendant filed its answer admitting the issuance of the policy of insurance, but denying liability thereon. On December 7, 1954, defendant amended its answer by alleging that the accident was caused directly or indirectly by fire and as such was expressly excluded from the coverage of the policy of insurance in question.

Prior to the trial the parties on January 3, 1955, filed a stipulation concerning the execution of the policy in question, and relating to the testimony of Harry D. Burns, Chief Technical Assistant in the office of the Chief Inspector of the Boiler Inspection Division of the Department of Labor of the State of Arkansas. Also, prior to the trial, upon stipulation of the parties the Judge of the Court, in company with the attorneys for both parties and under the guidance of Mr. Harold Claypool, plaintiff's superintendent, viewed the damaged boiler at its then location on the premises of plaintiff for the purpose of aiding the Court in following and understanding the testimony introduced at the trial.

The cause was tried to the Court, without a jury, on January 12, 1955, and at the conclusion of the trial the Court took the case under advisement, pending receipt from the parties of briefs supporting their respective contentions. The briefs have been received, and now the Court, having considered the pleadings, stipulations, ore tenus testimony of witnesses, exhibits, and briefs of the parties, makes and files herein its findings of fact and conclusions of law, separately stated.

### Findings of Fact

#### 1.

The plaintiff, Good Canning Company, is an Arkansas corporation having its principal office and place of business in the Fort Smith Division of the Western District of Arkansas. The defendant, London Guarantee and Accident Company, Ltd., is a foreign corporation of London, England, and is authorized to do and is doing business in the Western District of Arkansas. The amount in controversy, exclusive of interest and costs, exceeds the sum of $3,000.

#### 2.

On November 28, 1952, defendant issued to plaintiff a policy of insurance insuring plaintiff, for a peroid of three years from said date, against loss resulting from accident, as defined in the contract of insurance, to certain objects owned by plaintiff, including the boiler in question. The insurance contract also insured plaintiff against loss resulting from total or partial prevention of business on the premises caused by an accident to an insured object. More specifically, the insurance contract contained the following provisions:

"Insuring Agreement

"In consideration of the Premium, the Company agrees with the Assured respecting loss from an Accident, as defined, herein, occurring during the Policy Period, to an Object, as defined herein, while the Object is in use or connected ready for use at the Location specified for it in the Schedule, subject to the Declarations, to the Conditions, to other terms of this policy and to the Schedules and Endorsements issued to form a part thereof, as follows:

"Coverage A—Loss on Property of Assured

"To pay for loss on the property of the Assured directly damaged by such Accident (or, if the Company so elects, to repair or replace such damaged property), excluding (a) loss from fire concomitant with or following an Accident or from the use of water or other means to extinguish fire, (b) loss from an Accident caused directly or indirectly by fire or from the use of water or other means to extinguish fire, (c) loss from a combustion explosion outside the Object concomitant with or following an Accident, (d) loss from delay or interruption of business or manufacturing or process, (e) loss from lack of power, light, heat, steam or refrigeration and (f) loss from any other indirect result of an Accident; * * *."

Schedule 1 of the policy provides, inter alia:

"The Objects covered under this Schedule are designated and decribed as follows: * * * Description of Object (All Fire Tube Boilers) Class (2) Size (All Sizes) Coverage (*Limited*) Boiler Piping (Included) * * *.

"Definition of Accident

"C. (a) As respects any Object which is designated and described in this Schedule and for which the word 'Broad' is inserted in the column headed 'Coverage', 'Accident' shall mean

"1. A Sudden and accidental tearing asunder of the Object, or any part thereof, caused by pressure of steam or water therein, but cracking shall not constitute a sudden and accidental tearing asunder;

"2. A sudden and accidental crushing inward of a cylindrical furnace or flue of the Object caused by pressure of steam or water within the Object;

"3. A sudden and accidental cracking of any cast metal part of the Object, if such cracking permits the leakage of steam or water; or

"4. A sudden and accidental bulging or burning of the Object, or any part thereof, which is caused by pressure of steam or water within

the Object or which results from a deficiency of steam or water therein and which immediately prevents or makes unsafe the continued use of the Object;

but Accident shall not mean the cracking of any part of the Object other than a cast metal part, nor the tearing asunder, crushing inward, cracking, bulging or burning of any safety disc, rupture diaphragm or fusible plug, nor leakage at any valve fitting, joint or connection.

"(b) As respects any Object which is designated and described in this Schedule and for which the word "Limited" is inserted in the column headed 'Coverage', 'Accident' shall mean

"A sudden and accidental tearing asunder of the Object, or any part thereof, caused by pressure of steam or water therein, but cracking shall not constitute a sudden and accidental tearing asunder;

but Accident shall not mean the tearing asunder of any safety disc, rupture diaphragm or fusible plug, nor leakage at any valve fitting, joint or connection."

The policy contains the following endorsement:

"Use and occupancy (Valued) endorsement No. 1. This Endorsement forms a part of policy No. *PP 61990* and is effective from noon of *November 28, 1952.* Assured *Good Canning Company.* Item 1. Premium *$29.60 (included).* Item 2. Daily Indemnity—*One Hundred and 00/100.* Item 3. Limit of Loss— *Five Thousand and 00/100.* Item 4. Premises—*Jennie Lind Road, at Suburban Crossing, Fort Smith, Arkansas.* Item 5. Schedules, Pages or Endorsements of the policy— *Schedules Nos. 1 and 2 (or substitutes).* Item 6. Business—*Production.* Item 7. Commencement of Liability determined with respect to—*Time of Accident.* Item 8. Other Address for Notice of Accident—*17th Floor, Gulf States Bldg., Dallas, 1, Texas.*

"Insuring Agreement

"In consideration of the Premium specified in Item 1 and subject to the Exclusions and Conditions of this Endorsement, the Company hereby agrees, with respect to Business on the Premises described in Item 1,

"1. To pay the Assured the amount of Daily Indemnity, specified in Item 2, for each Day of Total Prevention of Business;

"2. To pay the Assured a part of the Daily Indemnity for each Day of Partial Prevention of Business; and

"3. To pay that amount of expense which is reasonably incurred by the Assured or the Company to reduce or avert Prevention of Business, but only to the extent that the total amount, that otherwise would have been paid under Sections 1 and 2 of this Agreement, is thereby reduced; provided the Total Prevention of Business or the Partial Prevention of Business is caused solely by an Accident, which occurs while this Endorsement is in effect, to an Object designated and described in any Schedule, Page or Endorsement, specified in Item 5, and while said Object is in use or connected ready for use; * * *

"Exclusions

"The Company shall not be liable for payment for any Prevention of Business * * *

"(2) Resulting from fire concomitant with or following an Accident or from the use of water or other means to extinguish fire;

"(3) Resulting from an Accident caused directly or indirectly by fire * * *."

At all times material herein the policy, together with its schedules and endorsements, was in full force and effect.

### 3.

The boiler in question is an H. R. T. boiler, sometimes referred to as a fire tube boiler. It, along with another boiler of the same kind, was installed at the plant of Good Canning Company, Fort Smith, Arkansas, in 1939 by the Boal Foundry and Machinery Company. There was no evidence as to the price paid for the boiler or the age of the boiler at the time it was purchased, but the testimony did disclose that the installation cost of the two boilers was $787.52.

The boilers were placed in a twin setting. They were suspended by beams or uprights, and each had its separate fire box or furnace. The boilers were large and cylinder-shaped, and were placed in a horizontal position parallel to the floor. The fire box or furnace for each boiler was directly beneath the boiler and extended the full length thereof, said furnace being fired by natural gas. A separate fire wall was constructed around each boiler. These fire walls were 42 inches thick, consisting of 24 inches of fire brick toward the inside and 18 inches of common red brick on the outside of the wall. The inside walls were mortared in with fire clay and the outside walls with Portland.

Each of the boilers had approximately 82 tubes or flues, each four inches in diameter, running through the entire length of the boiler and being parallel to the floor. The outer shell of the boiler, as well as the tubes, was made of high tensile steel. When a boiler was in place, the tubes were located in approximately the bottom half or two-thirds of the boiler, and under normal operating conditions there was a sufficient amount of water in the boiler to completely cover all the tubes. At the rear of each boiler was an arch which directed the heat from the furnace, beneath the boiler, back through the flues or tubes that extended through the lower part of the boiler. In other words, the heat caused by the gas fire in the furnace would reach the full length of the boiler, would be deflected by the arch sheet back through the flues or tubes toward the front part of the boiler, and would then pass out through the stack. The two boilers were connected to the same stack, and both received their water from the same tank, although each boiler had its own separate water pump. Each of the water pumps feeding the boilers was so designed that it would automatically cut off if the water line became obstructed.

The fire beneath a boiler, together with the fire and heat that passes through the flues, causes the water inside to boil, which in turn creates the steam used in the operation of plaintiff's canning processes. The two boilers had a common steam header into which the steam went and the steam was thence transmitted to the part of the plant where the canning was being done.

When a boiler is in full operation, the temperature in the furnace or fire box is approximately 1,000° to 1,800°. The flame reaches 18 to 20 feet under the boiler, which is substantially the full length of the boiler. After the fire under a boiler is turned off, the residual heat is great and it usually takes from 24 to 36 hours before a person can make a close examination of a boiler.

The present owners of Good Canning Company purchased the plant in 1950, and at that time the boilers were in place as above described. In 1952 or 1953 plaintiff had several automatic controls installed on its boilers. A "gas cut-off" control was installed that automatically cuts off the gas when a low water condition develops in the boiler. Another control automatically turns on the water pump when the water drops below the operating level. In this connection, the pump is a two-inch one and normally will refill the boiler to its proper level in forty to forty-five seconds. Still a third control was installed which causes a bell to ring when a low water condition develops. All three controls operate off of the same electronic board and are actuated by the same float.

In addition to the new controls, the boilers had two standard controls. One of these was a pop-off valve on the top of the boiler which was set for 100 pounds pressure (The boiler in question was rated for 120 pounds pressure.). The other safety control was a fusible plug which was located on the rear end of the boiler about two inches above the top row of flues or tubes. This plug was located slightly below the normal operating level of the water in the boiler. The plug contained a filler metal of tin or babbitt which would melt almost instantaneously at a temperature of 450°. At 100 pounds pressure the temperature of saturated steam is about 340°. Thus, as long as the water level was normal the filler metal would not be affected, but if a low water condition occurred the temperature would quickly reach 450° and the filler metal would melt, thus emitting a jet of steam and causing a hissing noise designed to warn the boiler operator of the low water condition. After the filler metal melts the opening in the fusible plug is approximately ¼″ in diameter.

The boilers could be, and sometimes were, operated manually without the controls, since some fuel economy could be gained by manual operation.

### 5.

The circular metal plates upon each end of an H. R. T. boiler are sometimes called flue sheets, and will be thus designated in these findings of fact. A flue sheet, in itself, is not strong enough to hold the pressure in the boiler, and the flue sheet must depend upon the flues or tubes to give it added strength. The process used in placing flues in a boiler is as follows: the flue end is inserted through a hole in the flue sheet; then a roller is used to expand and flare the flue end, making it fit tightly against the flue sheet; and finally the flared end of the flue is rolled back and beaded against the outside surface of the flue sheet. The beading itself adds little strength to the flue sheet, but the expanding of the flue ends adds substantial strength to the flue sheet, in addition to preventing leakage.

### 6.

Plaintiff's boilers were inspected annually by an inspector employed by the defendant Insurance Company. The boiler in question, No. 13617, was inspected in January of 1953 by Mr. L. H. Hammond, Jr., an employee of the defendant. At that time he recommended: "1. Fire brick arch and combustion chamber should be repaired where necessary. 2. Presently leaking tubes should be renewed. 3. Leaking section of steam line to top of water column should be renewed." About six months later Mr. Hammond returned and was informed that the repairs had been made. On January 30, 1954, Hammond again inspected the boiler, and on that occasion found nothing wrong with the boiler and made no recommendations.

### 7.

After the January inspection in 1954, the boiler was not operated until March 10, 1954. Between March 10, 1954 and April 10, 1954, the plant operated 23 days.

On April 10, 1954, Mr. Pat Franklin was the boiler operator then on duty. At approximately 10:00 a. m. Mr. Harold Claypool, plaintiff's superintendent, made a routine check of the boiler room. At that time Mr. Franklin was present in the boiler room. Mr. Claypool checked the water pump, water level and steam pressure, and found everything to be satisfactory. He then went to another part of the plant in connection with his other duties. About 10:30 a. m. Mr. Franklin went to the plant and informed Mr. Claypool that something had happened to the boiler (No. 13617). Claypool immediately went to the boiler room and noted that there was steam in the room and that the steam pressure had dropped to approximately 60 pounds. The fire had evidently either been turned down or off (either manually or by automatic control), since there was only a fire one foot in length under the front

end of the boiler. He went to the back side of the boiler and saw that the back wall had been moved approximately six inches and the mortar shattered. Water was running out through the back wall and Claypool shut the pump off. He returned to the plant to turn off some of the equipment that used steam, and then went back to the boiler room. He climbed on top of the damaged boiler and turned the valve of the damaged boiler off so that the undamaged boiler could still send steam into the plant. Claypool then noticed that a portion of the wall on the west side of the boiler had been moved about two inches. At that time the furnace was too hot to permit a close inspection of the damage, but the next day Claypool made a closer inspection and found that the boiler had been shaken in its setting.

He also found that the rear flue sheet and flue ends had been damaged substantially. The rear arch and the immediate inside of the furnace were cracked and separated from the wall, and it appeared that a large amount of water had spilled out into the furnace. A few of the flues were slightly warped, but none of them were warped severely. With more particular reference to the rear flue sheet and flue ends, the major part of the damage was confined to the upper portion of the flue sheet and upper four rows of flue ends. In this area the flue sheet had been warped and the flue ends separated from the flue sheet in numerous places. In some places the flue sheet had been pushed out almost completely beyond the flue ends and in other places the flue sheet had been warped inward causing the flue ends to protrude through the flue sheet. The maximum movement of the flue sheet out of its normal plane was from one half to three quarters of an inch, and the most severe damage occurred in the area of the upper left section of flue ends.

After the occurrence of the damage to the boiler, there was still water in the boiler covering the three lower rows of flues, and said water remained in the boiler several days. These three lower rows of flue ends and the corresponding area of the rear flue sheet did not appear to be damaged appreciably, and soot was present on the outside surface of the said lower portion of the rear flue sheet. The upper portion of the rear flue sheet, beginning with the fourth row of flues from the bottom, had a reddish or rust color indicating that said portion of the flue sheet and flue ends had been overheated. The filler metal in the fusible plug had been melted leaving a small opening (about ¼″) in said plug.

8.

As heretofore stated in finding of fact No. 7, immediately after the boiler was damaged, and again the next day, Mr. Claypool examined the boiler. It was his opinion, based upon these examinations and upon his experience in working with steam boilers and steam locomotives, that the damage was caused by weak flue ends or a weak flue sheet, or a combination of both, and was the result of a sudden occurrence.

On April 11, 1954, the day after the boiler was damaged, Mr. J. E. Plaxco, the owner and operator of a boiler repair shop in Fort Smith, Arkansas, inspected the damaged boiler and made an estimate of $5,000 as the cost of repairing said boiler. Upon the basis of his inspection of the boiler, and his experience as a boilermaker (15 years), Mr. Plaxco was of the opinion that the damage was caused by weak flue ends and was the result of a sudden occurrence.

On April 12, 1954, Mr. Lester Hammond, boiler inspector for the defendant, inspected the damaged boiler. His opinion, based upon his experience as an instructor of steam engineering at the United States Merchant Marine Academy, his experience as a boiler inspector, and upon two years sailing on a marine license, was that the damage was caused by a low water condition and that there was no explosion or sudden occurrence.

On April 21, 1954, Mr. Harry D. Burns, Chief Technical Assistant in the office of the Chief Inspector of the Boiler

Inspection Division of the Department of Labor of the State of Arkansas, and Mr. Woodrow Sandusky, Deputy State Inspector in said office, inspected the damaged boiler. (Mr. Sandusky had seen the boiler on April 12, but had not inspected it at that time. Mr. Burns made a subsequent inspection of the boiler on November 17, 1954.) At that time the boiler had been removed from the boiler room and placed upon a trailer. Mr. Burns and Mr. Sandusky did not talk to any of plaintiff's employees before making the examination on April 21, 1954, and they had no knowledge of the facts occurring either before or after the boiler was damaged. Basing their opinions solely upon their experience and upon an examination of the boiler after it had been removed from the boiler room, they were of the opinion that the damage was caused by a low water condition. However, at the trial Mr. Sandusky testified that his opinion did not take into account the fact, if it was a fact, that the brick walls had been moved, and that ordinarily a low water condition would not result in an event which would cause forty-two inch brick walls "to move around." He also stated that while he was of the opinion that low water caused the damage, he did not know what caused the low water.

9.

Automatic controls for boilers are in common use at this time, and while they are reasonably reliable, like any other mechanical instrument they sometimes fail. However, in the instant case none of the controls were damaged, and in fact they were installed on plaintiff's new boiler. In view of this fact, and the fact that the water pump was still working when Mr. Claypool reached the boiler room, the only reasonable inference is that the automatic controls were in good working condition at the time the boiler was damaged and that the water level in the boiler was normal.

10.

An evaluation of all the evidence convinces the Court that the damage to the boiler was caused by a combination of weak flue ends and a weak rear flue sheet, which suddenly gave way and were torn apart by the pressure of steam and water in the boiler, and that said damage was not caused by a low water condition in the boiler.

11.

The premium paid by plaintiff for "Limited" coverage was less than the premium that would have been required if plaintiff had purchased "Broad" coverage.

12.

Notice of the damage to the boiler was given to defendant's local agent on April 10, 1954, and written notice was mailed to defendant's office in Dallas, Texas, on April 11, 1954.

The defendant has denied all liability under the policy and has refused to indemnify plaintiff.

13.

After the boiler was damaged and it was learned that it would cost approximately $5,000 to repair the boiler, plaintiff's management, being fearful that the boiler might not pass State inspection after being repaired, decided to obtain another boiler.

There was little testimony as to the value of the damaged boiler. Mr. J. E. Plaxco testified that in his opinion a used boiler of comparable quality could be purchased for approximately $1,900 to $2,500. However, he gave no estimate of the cost of transporting and installing such a boiler, or of their availability upon the market.

As a matter of fact, plaintiff's management spent about three weeks attempting to obtain a suitable used boiler. They had the assistance of a representative of the State Boiler Inspector's Office, but were unable to find a used boiler that would pass State inspection. After three weeks of fruitless efforts, including two trips to Oklahoma City, plaintiff's management decided that it would be best to obtain a new boiler and avoid further loss of production.

Plaintiff then purchased a new firebox type of boiler and had it installed. The new boiler contains its own furnace, does not require the building of a brick wall around it, and therefore costs less to install than does a boiler of the H. R. T. type, such as the damaged boiler. The cost of purchasing and installing the new boiler was as follows: cost of boiler, $6,300; insulation, $396; pipe and fittings, $1,974.63; labor for installation, $1,481.89; making a total cost of $10,152.52.

Before the new boiler was installed it was necessary to remove the damaged boiler. This was done by removing the brick wall on the back, front and west sides of the boiler in order to take out the boiler. It was also necessary to remove some of the girders of the building before the boiler could be removed from the building.

The new boiler gives substantially the same service as the old boiler gave. It requires less gas to operate, but does not hold as much steam as did the old boiler.

### 14.

From the date the boiler was damaged, April 10, 1954, until May 11, 1954, plaintiff was forced to operate its plant with only one boiler, thus decreasing its production.

Also, during this period plaintiff was required to shut down operations nine days because of the damaged boiler.

Plaintiff's total loss of production resulting from the damaged boiler was $1,850.48.

### Discussion

Three questions are presented to the Court for determination. (1) Was the boiler damaged by an "Accident" as that term is defined in the policy? (2) Was the damage caused directly or indirectly by fire and thereby excluded from coverage under the terms of the policy? (3) If plaintiff is entitled to recover, what is the proper measure of damages, including the allowance or disallowance of statutory penalty and attorney's fee?

Plaintiff contends that the damage was the result of a sudden and accidental tearing asunder of the flue ends and flue sheet of the boiler, and therefore was caused by an "Accident"; that since the damage was caused by the pressure of steam and water against the weakened flue sheet and flue ends, and was not caused directly or indirectly by fire, and particularly not by a hostile fire, the exclusion clause of the policy is inapplicable; and that it should recover for damage to the boiler the replacement cost less twenty-five per cent depreciation, together with $1,850.48 to cover loss in production.

Defendant contends that the damage was caused by a low water condition and was not the result of a sudden and accidental tearing asunder of the boiler and thus was not caused by an "Accident" under the terms of the policy; that the damage was caused directly by the fire under the boiler, which had become a hostile fire because of the lack of sufficient water in the boiler, and therefore the loss was excluded from coverage; and that the evidence on the question of damages was insufficient to permit a judgment based on anything other than speculation and conjecture.

■ The question of whether the damage was caused by an "Accident" is a question of fact. Was there a "sudden and accidental tearing asunder of the Object, or any part thereof, caused by pressure of steam or water therein?" Unquestionably there was an accidental tearing asunder of part of the boiler in the instant case, and the disputed question is whether such tearing asunder was sudden and was caused by the pressure of steam or water in the boiler. The few reported cases that have considered similar insurance provisions offer little aid to the Court in the instant case other than to indicate that each case, of necessity, must be determined upon the basis of the particular facts appearing therein. See, Bower v. Aetna Ins. Co., D.C.Tex., 54 F.Supp. 897; Senn Products Corporation v. Hartford Steam Boiler Inspection

788

and Insurance Co., City Ct., 41 N.Y.S.2d 133; Travellers Indemnity Co. v. B. & B. Ice & Coal Co., 248 Ky. 443, 58 S.W.2d 640; Louisville College of Dentistry v. Hartford Steam Boiler Inspection & Ins. Co., 185 Ky. 778, 215 S.W. 941; New England Gas & Electric Ass'n v. Ocean Accident & Guarantee Corp., 330 Mass. 640, 116 N.E.2d 671; 8 A.L.R.2d 403.

The Court, after considering the opinions of the witnesses in the light of the physical facts, has concluded that plaintiff has sustained its burden of proof and has established by a preponderance of the evidence that the damage to the boiler was caused by an "Accident" within the meaning of the policy. The fact that a forty-two inch brick wall was moved approximately six inches by the occurrence is, in itself, almost conclusive proof that the damage was caused by the pressure of steam or water in the boiler and was the result of a sudden occurrence. That fact, together with the fact that a large amount of water spilled out of the boiler; that there was substantial damage to the boiler; and that the damage was most severe in the area of the upper left section of flue ends (indicating that said flue ends were weak and were torn loose from the flue sheet by the pressure of steam and water in the boiler), convinces the Court that the damage to the boiler was caused by a "sudden and accidental tearing asunder of the Object, or any part thereof, caused by pressure of steam or water therein."

In the opinion of the Court defendant's theory of the occurrence, i. e., that the damage was caused by a low water condition, does not coincide with the physical facts. Defendant's own witness, Mr. Sandusky, frankly admitted that his opinion did not take into account the fact that the brick walls had been moved. Mr. Hammond was of the opinion that vibration of the boiler might have caused the movement of the brick walls, but it seems that vibration of the boiler would have caused more general damage, rather than the localized damage at the rear of the boiler. Moreover, defendant's theory necessarily assumes the failure of some or all of the automatic controls. But, in view of the fact that the water pump was still working when Mr. Claypool reached the boiler room after the occurrence, and the fact that the identical automatic controls were thereafter placed on the new boiler and worked satisfactorily, it seems clear that there was no failure of the automatic controls. Even if the automatic controls had failed the fusible plug would have warned the operator of a low water condition, and thus defendant's theory assumes that the boiler operator was either not on duty or that if he was on duty he did not observe the warning or if he observed the warning he failed to take any effective action to ascertain and correct the trouble. Considering the fact that Mr. Franklin was an experienced boiler operator, that he was on duty at approximately 10:00 a. m. on the morning of the occurrence, and that at 10:30 a. m. on said morning he came from the direction of the boiler room to the plant to inform Mr. Claypool of the occurrence, it appears very unlikely that Mr. Franklin was absent from the boiler room at the time of said occurrence. Unfortunately, the death of Mr. Franklin and the lack of other witnesses make it impossible to ascertain definitely whether he was on duty at that time.

Another factor casting doubt upon defendant's theory is the small amount of warping sustained by the flues. Ordinarily when a low water condition exists for a considerable period of time (as would have been necessary to cause the damage in the instant case) some or all of the flues are severely warped. This would be true particularly with respect to the top row of flues which would be subjected to dry heat for the longest period of time. Thus, the fact that in the instant case there was only a slight warping of some of the flues militates against defendant's low water theory. No doubt this slight warping of some of the flues, the melting of the filler metal in the fusible plug, and the reddish color of the upper portion of the rear flue sheet and flue ends, were caused by the

residual dry heat passing through the boiler after the flue ends were torn loose from the flue sheet and much of the water had poured out of the boiler.

■ The conclusion of the Court that the damage to the boiler was not caused by a low water condition is decisive of the question of the exclusion clause as to damage caused directly or indirectly by fire. There is a split of authority as to whether such an exclusion applies only to external fires. Holmes v. Employers' Liability Assurance Corp., 70 Ohio App. 239, 43 N.E.2d 746 (holding that the exclusion applies to the fire in the fire box where it has become a hostile fire); First Nat. Bank v. Royal Indemnity Co., 193 Iowa 221, 186 N.W. 934 (holding that the exclusion applies only to external fires). However, both cases agree that the exclusion applies only to "hostile" fires, and since the Court has found that the damage was not caused by a hostile fire it follows that the exclusion clause is inapplicable in the instant case.

Therefore, plaintiff is entitled to recover under the terms of the policy, and the remaining question is the proper amount of said recovery. There has been no serious dispute concerning the plaintiff's loss of production, and it seems clear that plaintiff is entitled to recover $1,850.48 under the Use and Occupancy Endorsement of the policy. But there is a serious dispute between the parties concerning the damage to the boiler and the right of plaintiff to recover a penalty and attorney's fee.

■ As to the damage to the boiler, defendant contends that the evidence is insufficient to establish the actual cash value of said boiler. It is true, as defendant contends, that damages cannot be based upon speculation or conjecture. Missouri & Arkansas Railway Company v. Treece, 210 Ark. 63, 194 S.W.2d 203. But, when the cause and existence of damages have been established by the evidence, recovery will not be denied merely because the damages are difficult to ascertain. See, Rogers v. Stillman, Ark., 1954, 268 S.W.2d 614; Paul v. Camden Motor Company, Inc., 221 Ark. 702, 255 S.W.2d 418 (loss of profits); St. Paul Fire & Marine Ins. Co. v. Martin, 204 Ark. XVIII, 165 S.W.2d 606 (fire loss of feed); Penn-National Hardware Mutual v. Griffin, 174 Ark. 627, 296 S.W. 66, 53 A.L.R. 1106 (fire damage to merchandise); Black v. Hogsett, 145 Ark. 178, 224 S.W. 439 (loss of profits). Compare, Story Parchment Company v. Paterson Parchment Paper Company, 282 U.S. 555, 51 S.Ct. 248, 75 L.Ed. 544 (anti-trust suit); United States v. Griffith, Gornall & Carman, Inc., 10 Cir., 210 F.2d 11 (loss of profits); Mountain States Tel. & Tel. Co., Inc., v. Hinchcliffe, 10 Cir., 204 F.2d 381 (action against telephone company for negligent failure to furnish proper telephone service); Ginsberg v. Royal Ins. Co., 5 Cir., 179 F.2d 152 (smoke damage to clothing); Hawkinson v. Johnston, 8 Cir., 122 F.2d 724, 137 A.L.R. 420 (damages for breach of lease); Calkins v. F. W. Woolworth Co., 8 Cir., 27 F.2d 314 (breach of oral contract to negotiate lease); Walker v. Western Underwriters' Ass'n, 142 Mich. 162, 105 N.W. 597; Annotation, 78 A.L.R. 858.

In the instant case the policy provides:

"The limit of the Company's liability for loss on the property of the Assured shall not exceed the actual cash value thereof at the time of the Accident. If, as respects the damaged property of the Assured, the repair or replacement of any part or parts of an Object is involved, the Company shall not be liable for the cost of such repair or replacement in excess of the actual cash value of said part or parts or in excess of the actual cash value of the Object, whichever value is less. Actual cash value in all cases shall be ascertained with proper deductions for depreciation, however caused."

■ This insurance policy is a contract of indemnity whereby the defendant undertakes to make the plaintiff whole as against any loss it might sustain as a result of an accident, provided

that such amount does not exceed the actual cash value of the damaged property. See, Britven v. Occidental Ins. Co., San Francisco, California, 234 Iowa 682, 13 N.W.2d 791; Butler v. Aetna Ins. Co. of Hartford, Conn., 64 N.Dak. 764, 256 N.W. 214; McAnarney v. Newark Fire Ins. Co., 247 N.Y. 176, 159 N.E. 902, 56 A.L.R. 1149. The determination of "actual cash value" depends upon the type of property involved. See annotation, 56 A.L.R. 1155 et seq. The rule governing the facts in the instant case is stated in Travelers Indemnity Co. v. Plymouth Box & Panel Co., 4 Cir., 99 F.2d 218 (in construing a policy containing substantially the same provision as the instant case with respect to actual cash value) as follows, 99 F.2d at page 221:

> "There is no single and invariable legal rule or formula for the determination of actual cash value applicable to all kinds of property. Market value is of course the standard rule when we are dealing with .the kind of property which is freely and currently bought and sold; but where this condition does not prevail, other tests of value must be considered; and this is necessarily often true with respect to second-hand machinery of a particular make. In various cases, depending upon the nature of the property to be valued, evidence may properly be received as to the original cost, and cost of replacement, with due allowance for depreciation, and, where we are dealing with productive property, net income from its rental or other utilization; and in limitation of the valuation, as by the special condition of this policy, evidence may be received of sound value before the loss. McAnarney v. Newark Fire Ins. Co., 247 N.Y. 176, 159 N.E. 902, 56 A.L.R. 1149, and annotations 1155, 1162; * * *."

In the above quoted case the Court stated that the machine could have been repaired and that the defendant would have been entitled to an instruc-tion that the extent of its liability was the cash value of the parts which had to be replaced, with due allowance for accrued depreciation, and not in excess of the actual cash value of the whole machine. Compare, Travellers Indemnity Co. v. B. & B. Ice & Coal Co., 248 Ky. 443, 58 S.W.2d 640. Thus, in the instant case if the repair of the damaged boiler could have been made with reasonable assurance that the boiler would then meet State inspection requirements, the measure of plaintiff's damages would have been $5,000 (cost of repair) less accrued depreciation, if said sum did not exceed the actual cash value of the whole boiler. As to State boiler inspections, see Sec. 81–501 et seq., Ark.Stats.1947, Annotated. But, since there was no reasonable assurance that the damaged boiler could be repaired satisfactorily, plaintiff was justified in having it replaced, and the measure of damages is the actual cash value of the boiler, less depreciation.

To determine the actual cash value of the boiler the Court must consider all the evidence. It has been established that (1) the approximate cost of repairing the boiler would have been $5,000 and there was no assurance that it would then meet inspection requirements; (2) the cost of a used boiler of comparable quality would have been about $2,500, although such boilers were not always available; (3) plaintiff was unable to obtain a satisfactory used boiler (and the defendant did not elect to repair and replace the damaged boiler as it had the right to do under the terms of the policy), and in order to avoid further loss of production plaintiff, as a necessary and reasonable business measure, was required to replace the damaged boiler with a new boiler, at the following cost: price of new boiler, $6,300; insulation, $396; pipe and fittings, $1,974.63; labor for installation, $1,481.89.

Therefore, the plaintiff expended in replacing the damaged boiler the sum of $10,152.52. There was no direct evidence as to the amount of depreciation that should be charged to the damaged

boiler, but the evidence did disclose that the new boiler cost $6,300 and that the price of another boiler comparable in quality to the damaged boiler would be approximately $2,500. The difference between these two figures, i. e., $3,800, offers a fair estimate of the depreciation of the damaged boiler. The evidence also disclosed that the installation cost of the new boiler was $3,852.52, which was less than it would have cost to install a boiler of the type of the damaged boiler. Thus, if the formula of replacement cost ($10,152.52) less depreciation ($3,800 plus a small sum to cover the depreciation of pipe and fittings) were used as a guide in determining the actual cash value of the damaged boiler, the result would be approximately $6,000.

Plaintiff contends that 25% is an ample amount of depreciation, but the Court is of the opinion that the depreciation percentage should be higher. The fact that the accident involved herein was caused by the weak flue sheet and weak flue ends is indicative of the fact that the boiler had deteriorated appreciably. This fact, together with the fact that the boiler was already a used boiler at the time it was installed in 1939, convinces the Court that 40% depreciation would be a proper allowance in the instant case. The application of that depreciation percentage (40%) to the replacement cost ($10,152.52) would result in a figure of approximately $6,000 as an estimate of the actual cash value.

Likewise, there was evidence that the cost of repairing and replacing the damaged boiler would be about $5,000 and that after being repaired the boiler might not pass the necessary inspection, which would indicate that the difference in the actual cash value of the boiler before and after the accident was substantially in excess of $5,000.

The evidence also established that prior to the accident the boiler had been giving good service, and in fact that its service was comparable to the service subsequently given by the new boiler.

A consideration of all the evidence convinces the Court that the actual cash value of the boiler at the time of the accident, less depreciation, was $6,000. As a matter of fact there is little doubt but that the plaintiff has suffered damages in excess of $6,000, but the limit of defendant's liability under the policy was the actual cash value of the boiler and the Court has found that value to be $6,000.

The remaining question is whether plaintiff is entitled to recover a penalty and attorney's fee, and the proper answer to said question requires a review of the statutory and decisional law of Arkansas on the subject.

The original penalty and attorney's fee statute applicable to suits by beneficiaries against insurance companies was Act 115 of the Acts of the General Assembly of Arkansas for the year 1905. That Act, in substance, provided that, "In all cases where loss occurs, and the * * * insurance company liable therefor shall fail to pay the same within the time specified in the policy, after demand made therefor, such company shall be liable to pay the holder of such policy, in addition to the amount of such loss, 12 per cent damages upon the amount of such loss, together with all reasonable attorneys' fees for the prosecution and collection of said loss; * * *." The constitutionality of the Act was sustained by the Supreme Court of Arkansas on April 20, 1908, in the case of Arkansas Insurance Company v. McManus, 86 Ark. 115, 110 S.W. 797. In that opinion the Court considered similar statutes of other states as well as certain decisions of the Supreme Court of the United States and concluded that the statute did not violate any provision of the Constitution of the State of Arkansas. In the course of the opinion, at page 125 of 86 Ark., at page 800 of 110 S.W., the Court said: "* * * the business of insurance is of such a public character that it is a proper subject of distinct regulation, and the state is so interested in the speedy adjustment and payment of indemnity under insurance

policies for loss of life, health, or property of its citizens that penalties may be prescribed for unreasonable delay in that respect. These statutes are correctly based upon the theory that insurance companies, after loss occurs, have the insured at a great disadvantage and are in position to inflict great damage by mere delay in payment of losses. Therefore it is neither unjust nor unreasonable to inflict a penalty which will in some degree compensate for that injury where the resisted claim is finally adjudged to be just, and which will also tend to deter the company liable from interposing unnecessary delay in settlement." See also, Life & Casualty Ins. Co. of Tenn. v. McCray, 291 U.S. 566, 54 S.Ct. 482, 78 L.Ed. 987 (sustaining the Act).

At the time of the decision in the McManus case, supra, the statute only applied to fire, life, health and accident insurance companies.

On February 10, 1939, the General Assembly of Arkansas amended the Act by enacting Act No. 71 of the Acts of 1939. The amendment made the Act applicable to other types of insurance and also provided for the issuance of writs of attachment or garnishment in certain cases.

The Act was not amended again until February 17, 1953, Acts 1953, Act 82, when the General Assembly of Arkansas brought within the provisions of the Act " 'hospital, medical or surgical' " insurance companies. The same General Assembly, by Act 213, approved March 4, 1953, further amended the Act by adding the following: " 'This liability attaches when liability is denied by the insurer and suit is filed.' " This sentence was added immediately following the first sentence of the Act which reads as follows: " 'In all cases where loss occurs and the cargo, fire, marine, casualty, fidelity, surety, cyclone, tornado, life, health, accident, medical, hospital, or surgical benefit insurance company liable therefor shall fail to pay the same within the time specified in the policy, after demand made therefor, such company shall be liable to pay the holder of such policy, in addition to the amount of such loss, twelve (12) per cent damages upon the amount of such loss together with all reasonable attorney's fees for the prosecution and collection of said loss.' "

Prior to the last amendment of the Act, it was well settled that at any time prior to the final submission of the case the plaintiff, by amendment, could reduce his claim, and if the defendant insurance company failed to confess judgment for the amount of the reduced claim, said defendant would be liable for the penalty and attorney's fee if the plaintiff recovered the full amount of the reduced claim. Kansas City Fire & Marine Insurance Company v. Kellum, 221 Ark. 487, 254 S.W.2d 50; Progressive Life Insurance Company v. Hulbert, 196 Ark. 352, 118 S.W.2d 268; Great Southern Fire Insurance Company v. Burns & Billington, 118 Ark. 22, 175 S.W. 1161, L.R.A.1916B. Likewise, it was well settled that unless plaintiff recovered the full amount finally prayed for he was not entitled to recover the penalty and attorney's fee. St. Louis-San Francisco Railway Co. v. Travis Insulation Company, 215 Ark. 868, 223 S.W.2d 765; John Hancock Mutual Life Insurance Company v. Magers, 199 Ark. 104, 132 S.W.2d 841; Lincoln Reserve Life Insurance Company v. Jones, 178 Ark. 466, 10 S.W.2d 910; Pacific Mutual Life Insurance Company v. Carter, 92 Ark. 378, 123 S.W. 384, 124 S.W. 764.

In the instant case, at the time the complaint was filed, the plaintiff sought to recover $8,630.49 as damages to the boiler and the further sum of $1,680.85 as damages for total prevention of business for nine days and a partial prevention of business for eighteen days. The total amount sought in the original complaint was $10,311.34, plus a penalty of twelve per cent and a reasonable attorney's fee. During the trial the court, upon motion of plaintiff, allowed plaintiff to amend its complaint by reducing the claim of $8,630.49 to $7,615.14 and by raising the claim for $1,680.85 to $1,850.48, thus reducing the total claim to $9,465.62. The court has found that

the plaintiff is not entitled to recover the sum of $9,465.62. There was and is no dispute as to the correctness of the item of $1,850.48 for business loss, but the court has found that the claim of $7,615.14 damage to the boiler has not been established by plaintiff but that plaintiff is entitled to recover $6,000 for damage to the boiler as well as the sum of $1,850.48 business loss, or a total of $7,850.48.

Since plaintiff has not recovered the full amount of his final claim, as reduced by amendment, it is not entitled to recover a penalty and attorney's fee unless the 1953 amendment to the Act has effected a change in the prior existing law. In this connection plaintiff argues that:

"Giving this amendment the most strict construction which will leave it with any meaning, it appears to us to mean that where the insuror denies liability, as distinguished, perhaps, from a dispute as to the exact amount properly due, the insured is entitled to recover the damage (penalty) and attorney's fees provided by the statute, regardless of whether he recovers judgment for the precise amount prayed in the complaint. This would seem necessarily to follow from the clear language of the amendment, since otherwise liability for damage (penalty) and attorney's fees would depend upon the subsequent development of the case, as it did under the terms of the Supreme Court's construction of the former statute. These decisions held that *liability* under Ark.Stats.1947, Sec. 66–514, depended on the amount of recovery; it did not arise until the plaintiff recovered the amount demanded. If liability attaches when the suit is filed, it cannot in reason depend upon recovery of the exact amount demanded."

The Court finds it unnecessary to pass upon plaintiff's contention in this regard, since the Court has concluded that the amendment is inapplicable in

the instant case. As stated in Finding of Fact No. 2, the policy of insurance involved herein was issued to plaintiff on November 28, 1952. The amendment to the Act (upon which plaintiff relies) was not enacted until 1953. It is a cardinal rule of statutory construction that "Statutes should be construed as having prospective operation only, unless a contrary intent is definitely expressed or necessarily implied from the language used." State, ex rel. Attorney General v. Sebastian Bridge District, 204 Ark. 340, 161 S.W.2d 955, 956; Crowe v. Security Mortgage Company, 176 Ark. 1130, 5 S.W.2d 346. In fact, no statute should be given retroactive effect if it is susceptible of any other construction. Hardin, Commissioner of Revenues v. Fort Smith Couch & Bedding Co., 202 Ark. 814, 152 S.W.2d 1015. The same rule applies to amendatory Acts. Mogis v. Lyman-Richey Sand & Gravel Corp., 8 Cir., 189 F.2d 130; Peony Park, Inc., v. O'Malley, D.C.Neb., 121 F.Supp. 690, 693–694.

Likewise, a " ' "statute should not be construed * * * to affect contracts entered into prior to its passage, unless its language be so clear as to admit of no other construction." ' " Cook, Commissioner of Revenues v. Arkansas State Rice Milling Company, 213 Ark. 396, 210 S.W.2d 511, 514.

With specific reference to the penalty and attorney's fee statute, the Court in Arkansas Mutual Fire Insurance Company v. Woolverton, 82 Ark. 476, at page 482, 102 S.W. 226, at page 227 said:

"It will be noted that the statute just quoted (penalty and attorney's fee statute) was enacted after the issuance of the policy involved in this case, and the question is therefore presented whether the statute operated retrospectively, so as to warrant the assessment of damages and attorneys' fees on a policy written before its passage. We are clearly of the opinion that the statute can be given no such effect. The statute, if it be valid, materially affects the contract of insurance, and

it cannot be construed to affect or impair a contract already in existence when the statute was enacted. The Supreme Court of the United States has sustained the validity of a similar statute in Texas on the ground that it imposes a condition upon which insurance corporations could do business in the state. Fidelity Mut. Life Ins. Ass'n v. Mettler, 185 U.S. [308] 325, 22 S.Ct. 662, 46 L.Ed. 922. If the validity of our statute be sustainable upon that ground, it cannot apply to contracts of insurance in existence when it was enacted; for it was intended to impose only a condition upon which future business could be done. Policies already written were not subject to those conditions."

To the same effect, see State Life Ins. Co. of Indianapolis, Ind. v. Mitchell, 8 Cir., 126 F.2d 867; Arkansas Mutual Fire Ins. Co. v. Stuckey, 85 Ark. 33, 106 S.W. 203.

In the instant case there is nothing in the amendatory Act of March 4, 1953, to indicate that it was intended to have retroactive application. Therefore, the amendment is prospective in application and cannot aid plaintiff since the policy in question was issued prior to the time the Act was amended.

It follows that plaintiff, having failed to recover the full amount prayed for in its reduced claim, is not entitled to recover a penalty and attorney's fee herein.

### Conclusions of Law

1.

The Court has jurisdiction of the parties to and the subject matter of this action.

2.

The damage to the boiler in question was caused by an "Accident" within the meaning of the policy of insurance issued by defendant to plaintiff.

3.

The damage to the boiler was not caused directly or indirectly by fire, within the meaning of the policy, and said damage was not excluded from coverage under the terms of the policy.

4.

Plaintiff is entitled to recover of and from the defendant the actual cash value of the damaged boiler, less depreciation, and is also entitled to recover for its loss of production caused by the damage to said boiler.

The actual cash value of the damaged boiler, less depreciation, was $6,000, and plaintiff's loss of production was $1,850.48, making a total amount of $7,850.48 which plaintiff is entitled to recover of and from the defendant.

5.

Plaintiff has recovered an amount less than the amount it finally prayed for in this action, and it is not entitled to recover a penalty and attorney's fee of and from the defendant.

A judgment in accordance with the above should be entered.