## Travellers Indemnity Co. v. B & B Ice & Coal Co.

(Decided March 24, 1933.)

(Common Pleas Branch, Fourth Division).

TRABUE, DOOLAN, HELM & HELM for appellant.
WOODWARD, HAMILTON & HOBSON for appellee.

Opinion of the Court by Judge Richardson—Reversing.

The B & B Ice & Coal Company was the owner of a horizontal, tubular, 150 horse power boiler, encased with brick, and used by it in the manufacture of ice in its plant at Louisville, Ky. Its original cost was $1,500. It had been in use seven or eight years prior to its bursting which is the cause of this litigation. The cost of setting and encasing it was about $1,500, making the cost of the boiler in place at the time it was damaged, $3,000. The Travelers Indemnity Company, Hartford, Conn., for a premium of $218.40, issued its policy to the B & B Ice & Coal Company, insuring the boiler against explosion for a period of three years, beginning January 10, 1928, to January 12, 1931, 12 o'clock noon, standard time.

The policy defines the word "explosion" thus:

"'Explosion' shall mean only the sudden rupture or sudden collapse of a boiler or of its furnace, flues, or other parts, caused by pressure of steam therein, or if used for the storage of compressed air, caused by pressure of air therein."

The insurance company limited its liability by this clause:

"In no case shall the company be liable for more than the actual and immediate damage to property, estimated according to the true cash value of the property at the time of the explosion, proper deductions for previous depreciation having been made, nor in excess of the limits of indemnity."

The policy stipulates that the company's total liability on account of any one explosion shall not exceed $10,000.

It is claimed by the B & B Ice & Coal Company that on the 21st day of May, 1930, the boiler sustained a sudden rupture of its furnace caused by the operation of the steam therein, and it was thereby damaged $1,800. It gave immediate notice thereof to the Travellers Indemnity Company, but it failed and refused to pay the damage, hence this action.

The insurance company as a defense presents a traverse. A trial before a jury resulted in a verdict in favor of the B & B Ice & Coal Company for $1,800. The

insurance company is here seeking a reversal, claiming that the evidence does not show that the explosion was one within the terms of the policy, or if it was, then "the damages awarded by the jury were excessive, and not assessed according to the correct rule."

It concedes that a rupture occurred, but insists that it "was not sudden within the meaning of this word, as it is used in the policy."

On this theory, at the conclusion of the evidence of the plaintiff, and also at the conclusion of all the evidence, it offered a peremptory instruction which was refused by the court. The court gave instructions 1, 2, 3, and 4. Instruction No. 1 directed the jury if they believed from the evidence the boiler exploded, to find for the B & B Ice & Coal Company. Instruction No. 2 is a converse of No. 1; No. 3 defined the word "exploded" or "explosion" in the language of the policy, and No. 4 fixed the criterion of damages. The insurance company offered an instruction directing that unless the jury believed from the evidence the rupture of the boiler occurred suddenly, then there was no explosion. Instruction No. 2 offered by it merely directed the jury that the defendant had the right to repair the boiler, and that it was not liable for the cost of repairs if the explosion occurred as defined in insruction No. 1, offered by it. The determinant question is, "Was there a sudden rupture of the boiler as this term is used in the policy?"

The evidence for the insurance company shows that the cause of the damage to the boiler was a deposit of sediment, either of scale, oil, or other substance. The time ordinarily required for the assembling of such a deposit is from 10 to 12 hours. The effect of such deposit is that where it gathers the plate or metal opens after stretching down to a thinness of from 7/16 of an inch to 1/4 of an inch, getting so thin it cannot hold the pressure.

For the B & B Ice & Coal Company it is shown that the boiler would be operated for seven days; then taken out of use, permitted to cool down, inspected, and cleaned generally, and that it had been inspected and thoroughly cleaned by one of its employees going inside of it four days before it is claimed the sudden rupture occurred. On the day it is claimed it ruptured, as well as on every day, it was observed at intervals by the

foreman and other employees to enable them to know and determine it was intact at that point where a deposit usually gathers and causes a rupture. One or more of its employees claim that about 15 minutes before the aperture appeared, the boiler was examined and there was no appearance of a thinning of the plate at that point. When it occurred it "blowed down, blowed a round hole in it," about 12 inches in diameter and 4½ inches deep. It is reasonably certain that the proximate cause thereof was the assembling from the operation and force of the heat, and the remaining at the point of the opening, a deposit of some sort of substance, preventing an equal distribution of the heat, incident and necessary to the operation of the boiler. The proximate cause of the deposit is not the determinant question. The effect and operation of the steam and heat by reason thereof present the decisive issue. Was there a sudden drawing asunder or explosion as these terms are used in the policy? Webster's New International Dictionary defines "explosion" as a "sudden release of pressure as the disruption of a steam boiler." It is not indispensibly essential that the sudden rupture be accompanied by an extremely loud noise. Louisville College of Dentistry v. Hartford Steam Boiler Inspection & Insurance Co., 185 Ky. 778, 215 S. W. 914; Cleveland Drop Forge Co. v. Travelers' Indemnity Company, 114 Ohio St. 549, 151 N. E. 671, 672. In neither of these cases was there an explosion in its popular sense.

In the Cleveland Drop Forge Company Case, "it [the policy] provided that 'an "explosion" shall mean the sudden rupture or sudden collapse of a boiler * * * caused by pressure of steam.' 'Ruptures' are defined by lexicographers, generally, as a breaking or bursting asunder, and are more distinctly defined in Funk & Wagnall's Dictionary thus: 'To open or part, as a steam boiler, without extreme violence; distinguished from explosion; a splitting apart of a steam boiler as distinguished from burtsing or explosion.' See, also, Evans v. Columbian Insurance Co., 44 N. Y. 146, 4 Am. Rep. 650. The breaking apart of the boiler head, in which the rivets were sprung, therefore was a 'rupture' within the meaning of the policy for which the insurance company was liable. Moreover it was a 'sudden rupture' caused by the pressure of steam, for on the first parting of the rivets from the plate a rupture occurred, and liability immediately attached."

In Louisville College of Dentistry v. Hartford Steam Boiler Inspection & Insurance Co., a sudden rupture was defined as "a tearing asunder" of a boiler under the pressure of steam.

The description of the occurrence as it is given by the witnesses, i. e., "it blowed down, blowed a round hole," "about twelve inches in diameter and 4½ inches deep," is as graphical of an explosion or a sudden rupture as is the lexicographers' definition of either. It is our opinion that the evidence in behalf of the B & B Ice & Coal Company was not only sufficient to take the case to the jury, but clearly sustains its verdict as to this issue.

It is shown that after the boiler was ruptured it was repaired by the owners at the cost of $382.10, without affording an opportunity to the insurance company to repair it, by putting a patch and patch protector thereon. When first repaired it leaked. To prevent this another patch was put over the first, and then the protector was put on. After being so repaired it has been used continuously by the owner for the purpose for which it was originally purchased. The policy provides that the liability arising on account of an explosion, proper deduction for previous depreciation should be made in estimating the true cash value of the property at the time of the explosion. The instructions given by the court did not in the phraseology of the policy confine the jury to the cash value of the boiler at the time of its damage, having due regard for previous depreciation, but did confine it to its then condition, which was equivalent to using the language of the policy in this respect.

The evidence establishes that the durability, efficiency, and safety of the boiler may be restored by repairs, to the condition in which it was immediately before it was ruptured, either one of two ways, i. e., with a patch and patch protector or by removing the damaged sheet and inserting in lieu of it a new one, and that either method is "just as safe," "just as good" as the other. The cost of the new sheet, however, will be around $1,400. It is the consensus of opinion of the experienced men who testified for the parties that where a hole in a boiler is no larger and of the type of the one here involved, it is the universal custom of owners and operators of boilers to restore it

with a patch instead of using a new sheet, and, when patched as has been this one, it is regarded as useful, safe, and enduring as it was before it was ruptured.

The undoubtful and uncontradicted testimony of one of the witnesses in behalf of the B & B Ice & Coal Company, emphasizes the prevailing custom of so repairing boilers and continuing their use. However, the testimony of the president of the B & B Ice & Coal Company is that the boiler, since its damage, is worthless. That of M. A. Buehner, one of its engineers, is to the effect that it can be repaired only by the use of a new sheet. The declaration of the president that it is worthless is overcome by his admission that it has been in continuous use since it was patched, functioning the same as before it was damaged. The statement of Buehner as to the requirement of a new sheet is impeached by the same evidence.

Viewing the evidence in this light, the court should have instructed the jury that if it found for plaintiff, to find for it such sum as it believes from the evidence represents the difference between the fair, reasonable cash value of the boiler, in its then used condition, immediately before it was damaged, and the fair, reasonable cash value of the same immediately after it was damaged, not exceeding $1,800, unless it further believes from the evidence that after it was damaged it was patched as described in the evidence, and that such patch with the use of a patch protector restored the boiler to as efficient, safe, and enduring condition as it was in its used condition, immediately before it was damaged, in this event, to find for the plaintiff the cost of the patch and patch protector, and such further sum as it believes from the evidence represents the difference, if any, between its fair, reasonable cash value, in its then used condition, immediately before it was damaged and the fair, reasonable cash value thereof immediately after it was so patched, not exceeding the sum of $1,800.

The term "cash value," as used in the instructions, is the price which the boiler will bring when offered for sale by one who desires to sell, but is not compelled to do so, and is bought by one who desires to purchase, but is not compelled to do so.

It is further insisted that the jury awarded excessive damages. Since the case must be retried, we do

not deem it proper or necessary to consider the subject of excessive damages as the question may not again arise.

For the reasons indicated the judgment is reversed for proceedings consistent with this opinion.