**WELDERS SUPPLY, INC., Plaintiff-Appellee,**

v.

**AMERICAN EMPLOYERS' INSURANCE COMPANY, Defendant-Appellant.**

**WELDERS SUPPLY, INC., Plaintiff-Appellant,**

v.

**AMERICAN EMPLOYERS' INSURANCE COMPANY, Defendant-Appellee.**

**Nos. 15512, 15513.**

United States Court of Appeals
Sixth Circuit.

Feb. 12, 1965.

Edward D. Crocker, Cleveland, Ohio, Edward D. Crocker, Thomas V. Koykka,

Charles R. Sharp, Arter, Hadden, Wykoff & Van Duzer, Cleveland, Ohio, on brief, for American Employers' Ins. Co.

Stuard Wegener, Covington, Ky., for Welders Supply, Inc.

Before CECIL and EDWARDS, Circuit Judges, and McCREE, District Judge.

EDWARDS, Circuit Judge.

This suit is a sequel to the destruction by explosion and fire of plaintiff-appellee, Welders Supply, Inc.'s, acetylene gas plant in Cleveland, Ohio, on December 14, 1960. The defendant-appellant, American Employers' Insurance Company, was one of eight insurance companies which had insured portions of the total risk represented by this operation. Defendant had issued plaintiff a "Boiler and Machinery" policy limited to $100,000 per accident and limited to an "accident" to insured objects which were enumerated. These objects were a motor, a generator, a compressor, piping and manifolds which constituted the machinery for manufacturing acetylene gas.

The policy defined "accident" as follows:

"*Definition of Accident.* As respects any object which is designated and described in the schedule, 'accident' shall mean:

"1. a sudden and accidental breaking of the object, or any part thereof, into two or more separate parts, but not the breaking of any gasket, gland packing, shaft seal or diaphragm, nor the loosening of any assembled parts;"

It also contained exclusion clauses of which the following is pertinent to this appeal:

"EXCLUSIONS

"This policy does not apply:

\* \* \* \* \* \*

"(2) under coverage A to loss

"(a) from fire concomitant with or following an accident or from the use of water or other means to extinguish fire.

"(b) from an accident caused directly or indirectly by fire or from the use of water or other means to extinguish fire,

"(c) from a combustion explosion outside the object concomitant with or following an accident, * * *."

Undisputed facts show that at 8:30 on the morning in question two of plaintiff's employees had started up the acetylene plant and had just finished a "second" charge on 40 acetylene tanks when an explosion occurred. The severity of this explosion is in dispute, but it is clear that it seriously injured one of the employees, blew one 12-foot wall completely out, and occasioned considerable damage to the other walls and to at least some of the machinery in the building.

Immediately after the explosion three other employees of plaintiff who were in the office area ran to the acetylene plant and effected the rescue of the injured man. Within a minute or two after all personnel had left the damaged premises, there was a second explosion which was followed by fire and a series of explosions which ultimately reduced the whole plant to ruins.

■ Two questions of substance are presented by this appeal. The first is: Was there evidence from which the jury could have found that the initial explosion occurred inside insured machinery?

The second is: Was there evidence to support the jury's determination that the initial explosion (if covered) did $40,-953.70 damage to property covered by the policy?

The answers to these two questions we have searched for in an appellate record containing over 500 printed pages, and a good number of physical, photographic, and documentary exhibits.

This was obviously one of the best tried jury cases which this court has reviewed this year. By so saying we are, of course, implying an answer to the questions above because our ultimate conclusion is that both questions were the subject of vigorous factual controversy which ultimately was for the jury to determine.

■ The general rule in relation to such insurance controversies is that all factual disputes bearing on whether a loss is within the coverage of a policy of boiler insurance are for the jury to determine. Travelers' Indemnity Co. v Parkersburg Iron & Steel Co., 70 F.2d 63 (C.A. 4, 1934); Travelers Indemnity Co. v. B & B Ice & Coal Co., 248 Ky. 443, 58 S.W.2d 640 (1933).

■ And the rule of appellate review which in this diversity suit governs our consideration is stated thus:

"[W]e are concerned merely with finding whether there is substantial evidence to support the verdict." American Steel & Wire Co. v. Sieraski, 119 F.2d 709, 710 (C.A. 6, 1941). See also Dickerson v. Shepard Warner Elevator Co., 287 F.2d 255 (C.A. 6, 1961); Lovas v. General Motors Corp., 212 F.2d 805 (C.A. 6, 1954).

As to the first material appellate question, plaintiff's proofs tended to show that the source of the initial explosion was the "dissociation" or decomposition of acetylene gas in the high pressure dryer and adjacent piping in the filling room. Plaintiff's theory is set out succinctly in the testimony of one of his expert witnesses, Robert E. Hess:

"Q. (By Mr. Wegener) Now, from all your observations of the plant as you saw it on the 15th day of December, 1960, were you able to form an opinion as to what caused this explosion or this loss?

* * * * * *

"A. Yes.

"Q. What was your opinion based on?

"A. Well, on the plant conditions, including this drier, pipelines, compressor.

"Q. Tell the jury what your opinion was as to the cause of the destruction of the manufacturing system.

* * * * * *

"A. Well, I believe that the thing was caused by an explosion or dissociation of acetylene within the high pressure drier.

"Q. When dissociation takes place within the high pressure drier, will you tell the jury what normally occurs in the dissociation as a result thereof?

"A. Well, there is a great increase in temperature, which we covered in a previous question, too, a little, in that the molecule of acetylene breaks down into solid carbon, carbon black or soot; and the hydrogen is greatly expanded by the heat released from those molecules, so that the pressure runs up to tremendous heights. In my opinion, there seems to be no way to measure that at the moment of an explosion of that size. As I said, too, before, it usually results in the rupture of the containing vessel or pipeline, in the nature of an explosion, it happens within.

"Q. What kind of reaction does dissociation resulting in explosion normally result thereafter? Is there a chain of events normally set off by dissociation at a given point of acetylene gas?

"A. Well, it can lead—of course, the first or initial dissociation leads to what might be termed a chain reaction in that it's likely to follow the acetylene stream in one or both directions from the initial point; so that it's a continuing series of dissociations and explosions, all of them so closely connected, in my opinion, anyhow, as to be simultaneous. In other words, one continuous explosion, even though it is a chain reaction."

Mr. Hess' observations of the scene were part of the background of his opinion.

"Q. (By Mr. Wegener) Would you tell the jury what the condition was of the manifold lines in the filling room, as you observed them on the 15th day of December?

"A. Well, two of the lines were ruptured or split open.

\* \* \* \* \* \*

"Q. Did you observe the area of the building insofar as the northwest corner of the filling room?

"A. Yes.

"Q. What did you see there?

"A. Well, that's the area where this drier was located. I think this is a part of it on the table there, at the moment. That had been torn up in the condition that you see—at least, a section of it. The rest of it was widely scattered probably.

"Q. Did you observe any carbon black in this filling room on that date?

"A. Oh, yes.

"Q. What would be the source, if you know, of the carbon black located in the filling room?

"A. Well, undoubtedly from acetylene gas.

"Q. From what results of acetylene gas?

"A. Well, the combustion of acetylene, under certain circumstances, will release some carbon black because it's insufficiently supplied with oxygen. Of course, in the case of an explosion, it's apt to be heavier and more in evidence because there is no oxygen present to support the combustion of it following—

\* \* \* \* \* \*

"Q. Did you make an observation on the 15th insofar as Plaintiff's Exhibit No. 63?

"A. That's the one you just were looking at.

"Q. That is the large piece there on the table.

"A. Yes, I did.

"Q. Can you state what that piece is?

"A. Well, it's the top end of this so-called high pressure drier or de-

hydrator or dehumidifier, various names.

"Q. Is that the part located in the northwest corner of the filling room?

"A. Yes.

"Q. What were your observations pertaining to the high pressure drier?

"A. Well, that it had been ruptured or fragmented by explosive force."

■ Mr. Hess' qualifications are challenged by defendant-appellant, but it appears that he had worked a lifetime in the gas industry, much of it directly associated with acetylene gas production in high supervisory capacities. He also had helped install the machinery at the Welders Supply plant, and had the advantage of being called to the scene of the explosion on the day it occurred. We feel that the Trial Judge was correct in leaving the testimony given above to the consideration of the jury.

Defendant's theory of the initial explosion is effectively set forth by his eminently qualified expert, Dr. Bernard Lewis:

"Q. (By Mr. Crocker) Will you tell the ladies and gentlemen of the jury what your opinion is?

"A. My opinion is that the initial explosion took place in the acetylene filling room, in the room itself, and not within the pipe system of the filling equipment; as it could not have taken place inside of the manifold pipes or the drier, but my opinion is that the initial explosion occurred in the free space of the room itself.

"Q. Would you explain to the members of the jury why you have that opinion?

"A. In the first place, the fact that the east wall toppled over in the direction of east is indicative of a force coming from the west side to the east side. It is also indicative of the fact that this force had some duration. In other words, it was of the duration of the type that you get from a deflagration and not from a detonation.

"The reason for this particular part of my opinion is that there is not enough detonable acetylene in the pipe system to create a force or an impulse at the east wall that would topple the east wall, even if you could take all of this acetylene in these various manifolds pipes, and in the drier, and bring it together at some mean distance in the room, say, the middle of the room, it would still not create an impulse at the east wall if it were detonated to topple that wall. The time is too short, and the amount of acetylene is too small that is available.

"On the other hand, a relatively small amount of acetylene undergoing a deflagration in the room lasts for a time, which is of the order of about a quarter to a half a second, which is sufficient time to topple that wall with a relative small force.

"If the force had come from a detonation in the manifold pipe, as a result of the acetylene that was in the manifold pipe and the drier, it would create a force—sorry—an impulse at the east wall which would be 1/300 of that which would be necessary to topple that wall."

It is, of course, not essential to defendant's theory of the case for defendant to negate the explosion of the high pressure drier—a task which would be well nigh impossible on this record. Defendant seeks to establish that the high pressure drier explosion (and the explosion of attached pipes or manifolds) was not and could not have been the source of the *initial* explosion.

■ We regard the testimony of the surgeon who operated on plaintiff's employee Meffan as evidence which the jury could have looked at in resolving this crucial factual dispute as it did:

[Witness Dr. Daniel Degesys]
"I should state before I sent this

patient upstairs to surgery, we X-rayed his skull, and we noticed some foreign bodies—one particular one was in the orbit, if I remember correctly, on the left side in the orbit, close to the eye. And we noticed, on the X-rays, multiple small wire-like fragments were disseminated throughout the scalp, and there was a fracture in front of the head and extending—in the lower part of the skull—extending back on the left side.

\* \* \* \* \* \*

"Q. (By Mr. Wegener) Now, what, if anything, did you remove from Mr. Meffan's head by surgery, Doctor?

"A. I did remove a piece of metal, black metal, irregular shaped, which measured about 1—as I described—1½ centimeters in length —but pathologist described it was 1 centimeter in length—which I removed from the left forearm.

"Q. Did you remove any such type of metal from his scalp?

"A. Yes. I removed wire-like small fragments, multiple small fragments from the scalp."

Meffan was on the scene at the instant of the initial explosion. He was the only thing removed therefrom after the initial explosion and before the second explosion. His physical condition thereafter strongly suggests that he was the victim of an explosion which subjected him to injury by metallic fragments like shrapnel. The jury had a right to look on this evidence as highly persuasive as to whether the initial explosion was a contained explosion (consistent with plaintiff's theory) or an air blast (consistent with defendant's theory).

Among other items of evidence that the jury could have taken into account in reaching the finding favorable to plaintiff on this issue were:

1) The appearance of Exhibit 63—the head of the high pressure drier—which strongly suggests an internal explosion of tremendous force.

2) The corroborative testimony (by deposition) of plaintiff's other expert witness, Edward C. McLean.

3) The description of the initial explosion by eye witnesses Frank Cross, Wilfred Bonness, and Anthony A. Horvath.

■ By saying all of this, we by no means indicate that the finding of the jury was inescapable on this record, or even that, had we been on the jury, we necessarily would have joined in the verdict. Our appellate function is exhausted, under the standard of appellate review we have cited, when we find that taking the evidence from the point of view most favorable to the party who won it, there was substantial evidence to support that jury verdict. American Steel & Wire Co. v. Sieraski, supra.

■ Somewhat less lengthy treatment is required as to defendant-appellant's second material appellate issue. As is obvious from what has been said, plaintiff sought to emphasize damage done by the first blast, while defendant sought to prove that the first blast's damage was minimal and that subsequent fire and explosion (not covered by the policy) accounted for most of the damage.

After the fire careful appraisals of explosion and fire losses were made by experienced insurance appraisers on an item by item basis. The recapitulation of the explosion loss was testified to by plaintiff's president, Anthony P. Horvath, and by Forrest Aspinwall, who made the detailed appraisal of both explosion and fire loss.

Anthony P. Horvath testified as to damage claimed to have been caused by the explosion:

"Q. (By Mr. Wegener) What was the total loss on your recap on the 'Inventory Machinery' shown on this exhibit?

"A. $24,334.00.

"Q. What was the total recap on the 'Manufacturing Machinery'?

"A. $35,682.00.

"Q. Don't drop the cents.

"A. 11 cents.

"Q. There was 83 cents on the 'Inventory Machinery.' What is the amount shown as the total on the 'Building' loss?

"A. $23,107.16.

"Q. What does this exhibit show as the total loss?

"A. $83,194.10.

"Q. Now, this exhibit excludes the fire loss that occurred in the filling room that was contained by fire on December the 14th?

"A. Yes."

Plaintiff's testimony indicates that the total audited insurable loss from both explosion and fire was $111,978.23. The settlement paid on the nine other insurance policies, with a total fire and extended coverage of $81,000, was $56,988.93.

It does not appear that defendant contests these estimates so much as it argues that such damage was not properly recoverable under the policy defendant wrote, since the policy was limited to the results of the initial blast.

Defendant relies in this regard upon observation of the condition of building after the first explosion. One or more of the men who went into the building to rescue Meffan testified to observing the manifolds in place in the filling room, and to the fact that the generating room was normal.

Looking, however, again at the evidence favorable to plaintiff, we find:

1) Undisputed evidence that the initial blast was responsible for the blowing out of the east wall and its falling on the "inventory machinery" stored on the loading dock. The estimated damage to such machinery was $24,334.83. Plainly the jury could have considered this item as chargeable to the initial blast.

2) Assuming, as the jury apparently did, that the initial blast occurred in the high pressure drier and associated piping, the jury could have taken into account destruction of those items and related damage to the manifold system. Plaintiff's testimony clearly indicated that some force had served to blow at least ten of the "pigtails" loose on the manifold system. And we do not think (as defendant's argument suggests) that testimony to the effect that the manifold system was in its normal place after the initial explosion prevented the jury from considering that it had suffered severe damage from the first blast.

3) There was ample testimony from which the jury could have assumed that extensive damage had been done to all the walls and roof of the filling room sufficient to warrant considering that building area a total loss. There is no doubt that much greater damage ultimately reduced this area to rubble. But in regard to this subsequent damage concerning items two and three above, the jury could have considered the subsequent fire and explosions as "overkill" as far as the economic value of the machinery and building were concerned.

While it is highly likely that exactness in relation to a finding of damage in this situation is utterly impossible, we believe the jury verdict of $40,953.70 was within the range of the competent testimony, and was based upon substantial evidence. In this circumstance we do not reverse. Werthan Bag Corp. v. Agnew, 202 F.2d 119 (C.A. 6, 1953).

The charge of the Court, given by Judge Connell, is carefully drawn so as to state the complex issues of this case. It was meticulously fair. The definition of burden of proof contained therein was full and accurate. We find no prejudicial error in the charge. Rule 61 FED.R.CIV.P.

The judgment of the District Court in No. 15,512 is affirmed.

We regard the cross-appeal by Welders Supply in No. 15,513 as purely tactical and verging on the frivolous. It pertains to Count II of its complaint in which it sought recovery over and above the insurance contract for American's "bad faith" refusal to indemnify. The trial judge dismissed this count at the close of all proofs in the case.

Like the trial judge, we are able to find no proofs tending to sustain Welders' claim of "bad faith" refusal to in-

demnify or supporting Count II's claim as to damages.

We feel that the cross-appeal is patently without merit.

The judgment of the District Court is affirmed in both cases.