**WELDERS SUPPLY, INC., Plaintiff-Appellee,**

v.

**AMERICAN EMPLOYERS' INSURANCE COMPANY, Defendant-Appellant.**

**No. 15512.**

United States Court of Appeals
Sixth Circuit.

March 31, 1966.

2. Cf. 104 Cong.Rec. 16428 (1958) (Remarks of Rep. Dent.)

Edward D. Crocker, Thomas V. Koykka, Arter, Hadden, Wykoff & Van Duzer, Cleveland, Ohio, for appellant.

Stuard Wegener, Covington, Ky., for appellee.

Before EDWARDS, Circuit Judge, CECIL, Senior Circuit Judge, and McCREE, District Judge.

EDWARDS, Circuit Judge.

The fundamental issues bearing on liability in this case were dealt with extensively in Welders Supply, Inc. v. American Employers' Insurance Company, 342 F.2d 972 (C.A. 6, 1965).

Subsequently a motion for rehearing was filed which indicated a factual error in the court's opinion in dealing with the evidence bearing on damages. Rehearing was granted limited to the issue of damages, and reargument has now been had.

The gross facts against which the damage issue must be considered are these:

An acetylene gas manufacturing plant owned and operated by plaintiff, Welders Supply, Inc., was completely destroyed by explosion and fire on December 14, 1960.

Exhibit 18 shows the plant before December 14, 1960.

PLAINTIFF'S EXHIBIT 18

Exhibit 17 shows the plant on the afternoon of December 14, 1960.

PLAINTIFF'S EXHIBIT 17

There were proofs at trial from which the jury could have found total loss from all causes (excluding depreciation and salvage) to be $111,978.23.

There were ten insurance policies on the risk.

Nine of these insurance policies were for fire and extended coverage on the building and its contents—totaling between them $81,000.

Prior to trial of this case the insurance companies which issued the policies just referred to settled plaintiff's claims against them by paying $56,988.43. The settlement agreement was between all of the insurance companies and plaintiff, Welders Supply, and payment was not allocated to any item or class of damage.

Defendant was the tenth insurance company. It insured plaintiff's property from damage resulting directly from any contained explosion in a number of named pieces of machinery, but not against subsequent (or concomitant) non-contained explosions and fires. Its maximum liability was fixed at $100,000.

At trial plaintiff presented evidence from which the jury could have found total damage due to explosion alone of $83,194.10.

The trial judge carefully charged the jury that under defendant's policy it could find the defendant liable only for damage resulting from the specific risk defendant undertook to insure.

"Under the terms of the insurance policy, this Defendant agreed, subject to the declarations, to the limit per accident of $100,000.00 specified in the policy, and further subject to the exclusions and conditions, to other terms of the policy, and to the schedules and endorsements issued' to form a part thereof, to pay Plaintiff for loss on Plaintiff's property directly damaged by an 'accident,' as that term is defined in the policy.

"Now, we are about to give you the definition of 'accident' as the policy defines it. The policy defines an accident to mean a sudden and accidental tearing asunder of an insured object, or any part thereof, caused by pressure of contents therein, but cracking shall not constitute a sudden and accidental tearing asunder. The policy further provides that 'accident' shall not mean the tearing asunder of any safety disk, rupture diaphragm or fusible plug, nor leakage at any valve, fitting, joint or connection.

\*    \*    \*    \*    \*    \*

"The policy does not apply to loss on the property of the Plaintiff:

"From fire concomitant with or following an accident or from the use of water or other means to extinguish fire; or—this is No. 2:

"From an accident caused directly or indirectly by fire or from the use of water or other means to extinguish fire; or—this is No. 3:

"From a combustion explosion outside the insured objects concomitant with or following an accident; \* \* \*

\*    \*    \*    \*    \*    \*

"On the other hand, if the Plaintiff proves by the necessary degree of proof, which I shall describe to you in a moment, that a loss has occurred on its property as a direct result of an explosion inside one or more of the insured objects, then the Plaintiff would be entitled to recover in this action for such loss in accordance with the instructions we are about to give you. Further, if you find from the evidence and the instructions we give you, that some property of the Plaintiff has been directly damaged by an explosion occurring inside one or more of the five insured objects, while other property of the Plaintiff has been damaged as a result of fire occurring at the same time or following the explosion or from the use of water or other means to extinguish fire, or from an accident caused directly or indirectly by fire, or from the use of water or other means to extinguish fire, or that the property of the Plaintiff has been damaged as the result of a combustion explosion outside any of the insured objects, occurring at the same time or following an explosion inside the insured objects, or from any other indirect result of an accident; then, and in such event, the Plaintiff would be entitled to be compensated only for that part of the loss due to the damage to its property occurring directly as the result of the explosion inside one or more of the insured objects, and the Plaintiff would not be entitled to be paid for any of the other losses which we have mentioned."

The trial judge also referred to a computation which took into account depreciation, salvage, and the damage payment by the other insurance companies and stated plaintiff's maximum claim as $59,112.84. No exception was taken to this charge.

The jury found for plaintiff in the sum of $40,953.70.

At reargument, as we understood appellant's contentions, they were:

1) That the jury damage award cannot stand unless the record contains item by item proofs defining specifically just how much damage was done by the initial explosion as opposed to subsequent explosions and fire.

2) That the jury could not under the testimony take into account any damage to the inventory machinery.

3) That the record compelled the jury to accept defendant's evidence and conclusions as to how the $56,988.43 paid by

the other insurance companies should be allocated.

■ As to the allocation problem, we believe that when the trial judge limited jury consideration to a maximum recovery by plaintiff of $59,112.84, he thereby specifically excluded the possibility that the jury might award plaintiff damages which had already been paid for by the other insurance policies. Defendant did not then object to this instruction. Having enjoyed the benefit of the instruction at trial, he is not now, in our opinion, entitled to argue the allocation question on appeal—particularly in view of the fact already noted, that the settlement agreement itself did not undertake to allocate the sum paid to any particular class of damages.

■ As to the first and second arguments, as a matter of law plaintiff is entitled to have us view the conflicting evidence from the point of view favorable to the plaintiff, which the jury obviously took. It is also entitled to such fair inferences from such favorable view of the evidence as the jury might reasonably have drawn. Miller v. Chattanooga Auto Parts, 350 F.2d 851 (C.A. 6, 1965); Stevens v. Continental Can Co., 308 F.2d 100 (C.A. 6, 1962), cert. denied, 374 U.S. 810, 83 S.Ct. 1702, 10 L.Ed.2d 1034 (1963); American Steel & Wire Co. v. Sieraski, 119 F.2d 709 (C.A. 6, 1941).

The basic conflict in evidence pertains to the violence of the first explosion. We have previously held that the jury could properly have viewed the first explosion as being covered by defendant's insurance policy, along with all damage directly resulting therefrom to any of defendant's property.

As we noted previously, the problem we deal with is one of overkill. Clearly the destruction for which plaintiff seeks recovery occurred to a degree which not only destroyed the economic value of the building, its machinery and contents, and the inventory machinery, but ultimately left all of these in a heap of fire-charred rubble. It is the separation of the damage which may properly be attributed to the first contained explosion from that occasioned by the second and many subsequent explosions and the fire that occasions our difficulty with the damage question.

Appellant would have us believe that the first explosion was a relatively minor one. There is indeed evidence from which the jury could have found that the first explosion was less violent than the second. On the other hand, that evidence is by no means undisputed, and when the jury has found for the plaintiff under the instruction of the court on this issue, it is clear that we are required on appeal to take the disputed facts as the jury must have seen them.

The facts favorable to the plaintiff in relation to the damage wrought by the first explosion may be summarized in these eye witness accounts of that first explosion:

## THE FIRST EXPLOSION

a) *From inside the building.* There were two men inside the plant when the first explosion occurred. Meffen, who was seriously injured by the blast, testified:

"Q Now, at the instant that the explosion occurred, tell the jury from that second, or right previous to that second and shortly thereafter, what is your best recollection as to what occurred, insofar as you remember?

"A As far as I remember, I felt as though I was immediately thrown into the air. I was then totally without sight because, after that, I seen nothing. It seemed as though I landed on the floor, and that's where I was getting up from, and I made an attempt to get out of there. * * *"

Honecy, who was standing near the southeast corner of the building, testified:

"Q Now, while you were standing in that position, right at the moment of the occurrence, will you tell the jury

what you heard, what you saw, and what you felt?

"A   Well, I heard a terrific explosion, and I turned around and I looked to see where Jim was, and I couldn't see him; and I knew he was in there in the manifolds."

b) *The east wall.* Honecy also testified:

"Q   Did you observe, at that time, whether or not any of the wall had been knocked down around the manifold area?

"A   I didn't, not at the time, but I—

"Q   Your best recollection as to what you saw at that instant.

"A   *I didn't see the back wall, but I know there was no wall in the front of me.*

"Q   Now, what did you then do after your cap and your glasses flew off; did you pick up your cap and glasses?

"A   I picked up my glasses, and I ran out, and I seen the guys coming across the yard.  So I hollered—

"Q   Where did you run out, do you remember the approximate area?

"A   Right about where that blank space is.

"Q   This designates a door (indicating on diagram).

"A   Yes.  *There was no door there.*" (Emphasis added.)

Richard A. Konnerth testified:

"Q   Now, at the time right immediately prior to the explosion, tell the jury, in your own words, just what you saw, and just what you felt?

"A   Well, at the time prior to the explosion, Will Bonness and I were talking, and I was facing the street— and the acetylene plant would have been on my right—and, as I say, we were talking, and we heard this dull thud.  And, naturally, the nature of the thud, the direction the noise came from, we looked across the acetylene plant, and the glass shattered in the door, and several of the windows shattered, and the wall of the acetylene plant appeared to just jump out about two feet and toppled.

"Q   Did the ground shake at the time of this boom?

"A   Yes, it was quite a concussion. You might say we felt the ground shake, too.

\*     \*     \*     \*     \*     \*

"Q   Now, at the time that you were approaching the dock—or the building —what did you observe insofar as the entire wall was concerned?

"A   Well, it seemed to be all down along the front, especially since there was—I noticed it because there were two trucks, and I can't remember if it was one or two cars, parked in front of the dock; and I noticed that the wall itself had fallen on these vehicles."

Anthony A. Horvath's testimony on this point was:

"Q   Now, when you were crossing, how many walls did you see were down at the time you were running across the veranda?

"A   The only wall that I noticed was down was the whole east wall.

"Q   The whole east wall.  You mean this entire wall here (indicating on diagram)?

"A   Except for a few fragments.

"Q   This whole wall was affected at the time you first observed it?

"A   Yes.

\*     \*     \*     \*     \*     \*

"Q   Now, at the time you approached the building, was there any debris on the loading dock?

"A   No.  The whole east wall was on the loading dock and off of the loading dock.  It even fell beyond the loading dock.

"Q   You mean debris was over the loading dock and beyond toward the oxygen building?

"A   The wall is 12 foot high above the loading dock, and the dock is 6 foot wide, so 6 foot of it fell on it, and the rest of it fell off onto the ground."

c) *The west wall.* Frank Cross, who was in a building across the street from the Welders Supply plant, testified:

"Q Now, directing your attention to December 14, 1960, did you observe any unusual occurrence at Welders Supply that morning?

"A Well, at about 8:30, they had this terrific explosion. I was standing in our sales manager's office looking out the window directly at the building that exploded.

"Q Where were you looking directly at, what part of the Welders Supply building?

"A At the west wall. That's what I could see, the west of the building, and the front wall. The rear wall of the building, we are unable to see.

"Q Now, tell the jury what you observed at this instant?

"A Well, it was approximately 8:30, I was talking to our sales manager, and I was watching traffic—that's so heavy—going down Train Avenue; and all at once there was this terrific explosion. The west wall of the building was blown completely out. And I said, 'My God,' I said 'Welders Supply had an explosion.'

"And as quick as I could gather my senses, I ran out into the street, tried to stop the traffic. And minutes after that, why, our office girl, she got excited, and we had to get her away from the office because we thought our office would go. And minutes after that, there was another explosion.

"Q To go back to the first explosion: what did you observe, to the best of your recollection, insofar as the west wall?

"A It was blown in—

"Q Insofar as the force to the wall?

"A It was a terrific force. The wall, it blew out in bits, like it was shot out of a cannon.

"Q Which portion of the wall are you now referring to?

"A The west wall.

"Q The west wall. In other words, Train Avenue is here; your office is over here (indicating on diagram)?

"A Yes.

"Q In relationship to this west wall line of the Welders Supply building, approximately what area did you see this wall come out like it was shot out of a cannon?

"A The whole front side of the west wall came out, clear back, I would say, better than three-quarters of the way.

"Q Now, in the relationship to how you were standing in your office over there, from your eye level, could you see into—through the window in this area here (indicating on diagram)?

"A Well, yes, you could have seen in.

"Q Now, at the time you heard this explosion, did the ground shake?

"A Terrifically."

d) *The south wall.* Frank Cross also testified as follows:

"Q Was the front wall in as a result of the first explosion?

"A Was it in?

"Q Yes; still up, as far as the wall?

"A Yes, it was up, but—you couldn't look at it and see—but it was damaged, the front wall was damaged.

"Q Now, did you observe whether or not the glass flew out of the front—over the Train Avenue wall—at the time of the first explosion?

"A Yes, I think it did."

e) *The north wall.* Anthony A. Horvath's testimony regarding the north wall is as follows:

"[A]nd from what I observed, the walls seemed to be intact, and some of the windows were blown out of the two rear—large windows in the back, north wall.

\* \* \* \* \* \*

"When the whole thing was over, the rear wall was still standing erect, but it was dislodged."

f) *Damage south of the plant.* Frank Cross testified:

"Q   What was the result of the shaking of the ground in your place of employment?

"A   It took the acoustic ceiling off of three of the offices, and knocked the fluorescent lights down, and cracked some of the wall, I guess."

g) *Impact north of the plant.* Father Edward J. Stanko testified:

"Q   Please state your name and address.

"A   Father Edward J. Stanko, 2281 Columbus Road.

\*   \*   \*   \*   \*   \*

"Q   Are you in the general geographical area of Welders Supply, located on Train Avenue?

"A   Not very far away; just on top of the hill.

"Q   You say on top of the hill?

"A   Yes, sir.

"Q   The Welders Supply, is that located in a valley?

"A   Yes, sir.

"Q   Directing your attention to the 14th day of December, 1960, did anything unusual occur while you were conducting services there at your parish?

"A   Well, you see, on week days, why, we start our services at 6:30 and 8:15; and, that day, it was my turn to have services at 8:15.   I was about halfways through with the Mass, when I heard a terrific explosion, and I thought that—I was worried about the children—I thought it was right in the church or on the grounds close by, because the whole church shook, and the altar vibrated.   So when this explosion came, that's when it happened, about halfways over, around 8:30."

h) *Damage to manufacturing machinery.*   Richard E. Hess testified:

"Q   Would you tell the jury what the condition was of the manifold lines in the filling room, as you observed them on the 15th day of December?

"A   Well, two of the lines were ruptured or split open.

\*   \*   \*   \*   \*   \*

"Q   Did you observe the area of the building insofar as the northwest corner of the filling room?

"A   Yes.

"Q   What did you see there?

"A   Well, that's the area where this drier was located.   I think this is a part of it on the table there, at the moment.   That had been torn up in the condition that you see—at least, a section of it.   The rest of it was widely scattered probably.

"Q   Did you observe any carbon black in this filling room on that date?

"A   Oh, yes.

"Q   What would be the source, if you know, of the carbon black located in the filling room?

"A   Well, undoubtedly from acetylene gas.

"Q   From what results of acetylene gas?

"A   Well, the combustion of acetylene, under certain circumstances, will release some carbon black because it's insufficiently supplied with oxygen.  Of course, in the case of an explosion, it's apt to be heavier and more in evidence because there is no oxygen present to support the combustion of it following—

"Q   Did you observe the condition of the machinery in the machinery room on the 15th of December?

"A   Yes, I did.

"Q   What did you see there?

"A   Well, this compressor located near the north wall had been—

"Q   This compressor here (indicating on diagram)?

"A   That compressor is correct.

\*   \*   \*   \*   \*   \*

"A   (Continuing)—was damaged on the discharge end of it.   There is a pipe coil in connection with that piece of

machinery, which is usually called an after cooler, meaning that after the acetylene has passed the final state of compression, it is cooled or reduced in temperature. That coil had been torn up by explosive force. The entire operating end of the compressor is contained in a water tank up at the top. The tank had been pushed out of shape, some of the rivets torn out of it, and so forth.

"Q   Did you observe anything pertaining to the gauges on the compressors?

"A   Well, I think one gauge was badly torn up, the dial or—

"Q   Which gauge are you referring to?

"A—or scale. That was the—I believe the third stage or high pressure gauge—highest pressure gauge.

\*   \*   \*   \*   \*   \*

"Q   What were your observations, also on the acetylene generator on the 15th?

"A   Well, the generator was damaged to a considerable extent by some explosive force and perhaps some heat following that. Many of the control instruments and working parts of the generator were out of order.

"Q   What were your observations pertaining to these Mercoid switches that were located on the outside of the building?

"A   Well, as I recall it, those had been put out of commission by the explosive force concerned."

▉   With such testimony (and much more of like nature) before it indicating an explosion of sufficient violence to destroy the two longest walls of this building, to damage both the north and the south wall, and to do physical damage on premises completely separate and removed from this plant the jury awarded $40,953.70. This award represents less than half of the damage plaintiff's witnesses testified was done by explosion alone. It represents approximately 70 per cent of the $59,112.84 which the trial judge had charged as the plaintiff's maxi-mum claim after deducting for damage for which other insurance companies had paid. We find it impossible on this total record for us to conclude that this jury did not have before it evidence sufficient to sustain this award.

In arriving at this conclusion we have by no means ignored the arguments advanced by appellant. All of them, of course, were properly advanced by its able counsel before the jury which had the duty to and did indeed make the finding on damages.

▉   Viewing the testimony, as the jury could have seen it, on view favorable to plaintiff, we are unable to hold, as appellant asks, that the destroyed inventory machinery be eliminated entirely from any accounting for explosion damage due to the first blast. We recognize here (as we mistakenly failed to do at the first hearing) that there is no testimony in this record as to exactly at what point during this holocaust the inventory machinery was totally destroyed. But we are unable to say that with an explosion of this violence the jury did not have a right to weigh the inventory machinery's proximity to the blast and the probability of some damage to it in its total assessment of damages.

Further, it appears to us that the award which the jury gave could appropriately have been arrived at by it if it concluded that only minimal damage had been done to the inventory machinery by the first blast.

Nor do we believe that the testimony of the three members of the Meffan rescue party when cross-examined about what they saw inside the building after the first blast required the conclusion urged by appellant that only nominal damage had resulted from that first blast. These men were on a mission of high urgency, with their and their fellow workman's lives at stake. They could hardly have been expected to appraise splits and leaks and distortions in piping and machinery capable of rendering such machinery economically valueless, as would a calm insurance appraiser on the scene after the events were over. Nor could they inspect

walls, or roof, or supporting members for cracks or displacements which, absent total destruction, could nonetheless require replacement.

■ Finally, we turn to the argument that plaintiff in order to recover under this policy had the duty to prove by detailed evidence item by item the exact amount of damage done by the first blast, as opposed to the exact amount of damage done by subsequent blasts and fire. This view would require a meticulous inventory and appraisal of first blast damage in the very midst of a holocaust. This policy was specifically written for this industry and its language contemplated the possibility of an initial contained blast with direct damage and subsequent noncontained explosions and fires.

Were we to adopt the defendant's view of proof required by this policy in this sort of industry, we would render the policy utterly useless to a purchaser because of the impossibility of such proofs. The law imposes no such standard.

In Lee Shops, Inc. v. Schatten-Cypress Co., 350 F.2d 12 (C.A. 6, 1965), cert. denied, 308 U.S. 980, 86 S.Ct. 552, 15 L.Ed.2d 470 (1966), this court said:

"Merely because the damages may be uncertain in amount or cannot be shown with certainty in the exact amount does not mean that they cannot be recovered. It is sufficient if the evidence shows the extent of the damage as a matter of just and reasonable inference, although the result be only approximate. Story Parchment Co. v. Paterson Parchment Paper Co., 282 U.S. 555, 51 S.Ct. 248, 75 L.Ed. 544 (1931)." Lee Shops, Inc. v. Schatten-Cypress Co., supra at 18.

In the leading case relied on above, the United States Supreme Court set forth this commentary on damages:

"Nor can we accept the view of that court that the verdict of the jury, in so far as it included damages for the first item, cannot stand because it was based upon mere speculation and conjecture.

This characterization of the basis for the verdict is unwarranted. It is true that there was uncertainty as to the extent of the damage, but there was none as to the fact of damage; and there is a clear distinction between the measure of proof necessary to establish the fact that petitioner had sustained some damage and the measure of proof necessary to enable the jury to fix the amount. The rule which precludes the recovery of uncertain damages applies to such as are not the certain result of the wrong, not to those damages which are definitely attributable to the wrong and only uncertain in respect of their amount. Taylor v. Bradley, 39 N.Y. 129, 4 Abb. Ct. App. Dec. 363, 366, 367, 100 Am. Dec. 415." Story Parchment Co. v. Paterson Parchment Paper Co., 282 U.S. 555, 562, 51 S.Ct. 248, 250 (1931).

See also Restatement, Contracts § 331, Comment a at 515 (1932).

Ohio appears to be in accord with this general view. Burckhardt v. Burckhardt, 42 Ohio St. 474, 499 (1885); Lovelady v. Rheinlander, 66 Ohio App. 409, 415, 34 N.E.2d 788 (1940); 16 Ohio Jur.2d, Damages § 14 (1955).

We now reiterate the basic holding on the damage issue contained in this court's previous opinion:

"While it is highly likely that exactness in relation to a finding of damage in this situation is utterly impossible, we believe the jury verdict of $40,953.-70 was within the range of the competent testimony, and was based upon substantial evidence. In this circumstance we do not reverse. Werthan Bag Corp. v. Agnew, 202 F.2d 119 (C.A. 6, 1953)." Welders Supply, Inc. v. American Employers' Insurance Co., supra, 342 F.2d at 978.

Affirmed.

McCREE, District Judge (dissenting).

I respectfully dissent from the opinion of the court, which on rehearing is limited to the issue of damages.

This action was brought on a limited risk insurance policy which subjected the

insurer to liability only for property damage directly caused by an explosion occurring in any of the specifically enumerated insured objects. There is no question here that a series of explosions took place which, with consequent fire, eventually so demolished the insured's premises as to justify the use of the descriptive term, "overkill". However, there is also no question that the insurer, on this particular policy, was only liable for the damage occasioned by the first explosion, and clearly was not liable for damage caused by subsequent fire and explosion. The jury returned a verdict of $40,953.70, and our only inquiry on rehearing is to determine whether there was sufficient evidence in the record to support a verdict in that amount.

As this case is founded upon diversity jurisdiction, we must apply the law of the forum state, Ohio, to the issues presented. Consistent with general principles, Ohio law imposes upon a plaintiff the burden of establishing by a preponderance of the evidence each fact which must be proved in order to maintain the cause of action. The jury is not permitted to speculate upon the existence of a material fact. Venable v. Aetna Life Ins. Co., 174 Ohio St. 366, 189 N.E.2d 138 (1963). In addition, consistent with general principles, Ohio law also requires that the extent of the damages be established by a preponderance of the evidence. The failure to sustain such burden results in an award of merely nominal damages at best. Anderson v. American Bankers Ins. Co., 99 Ohio App. 183, 132 N.E.2d 256 (1954) (by implication). This is true even where there is some evidence of recoverable damage, but where there is insufficient testimony from which the jury could make a proper determination of the extent of the damage actually suffered. *Ibid.*

I agree with the opinion of the court in its assertion that plaintiff is entitled to have this court consider the conflicting evidence from the point of view most favorable to it, and is further entitled to such fair inferences therefrom as the jury could reasonably have drawn. I also agree that the total amount of the verdict cannot be supported without attributing some damage to the inventory machinery, which was stored outside, immediately adjacent to the north wall of the building, although it is extremely difficult if not impossible to ascertain the exact amount from the record before us.

As the majority opinion correctly points out, there is no testimony in the record as to exactly at what point during the series of explosions, described as a holocaust, the inventory machinery was extensively damaged. However, the majority were "unable to say that with an explosion of this violence the jury did not have a right to weigh the inventory machinery's proximity to the blast and the probability of some damage to it in its total assessment of damages." This is the point of my dissent because I believe that any finding of damage to the inventory machinery, on the evidence before the jury, could be only the consequence of speculation and conjecture.

There is no direct evidence that the inventory machinery was even minimally damaged by the initial explosion. In this respect, it is significant to note that the only evidence of first-blast damage to the north wall, which stood between the building interior and the machinery, was the blowing out of some glass panes from the large windows in that wall. Although there is evidence from which the jury could have found damage to the other three walls resulting from the first explosion, the north wall remained standing, although dislodged, even after the series of explosions had ended and the fires had been extinguished. In addition, there is uncontroverted evidence that the equipment in the generating room, situated immediately inside the north wall, appeared normal and functioning after the first explosion.

A jury finding that "some damage" had resulted to this inventory machinery from the first explosion would be a permissible inference if there had been only one explosion, following which damage had been found. However, since there were several explosions and destructive

fires, it is just as reasonable to infer that damage to this machinery occurred as a consequence of one or more of the subsequent explosions, of the fire, or of the fire-fighting activities, as it is to infer that it occurred from the initial blast. Since there is no evidence that the north wall was dislodged by the first explosion or that the generating room machinery was substantially damaged until later, the more probable inference is that some factor other than the initial blast was responsible for the damage to the inventory machinery.

In short, there is no evidentiary basis for giving preference to the liability producing inference, since the other inferences are at least as compelling if not more so. There is also no evidence from which the jury could have found the amount of damage to the inventory machinery, if any, attributable to the first explosion as is required by the Ohio cases cited supra. On this record, the jury could only speculate on these critical questions.

On this point, the Ohio Court of Appeals upheld an award restricted to merely nominal damages where the plaintiff could not sustain his burden to separate the insured loss from the loss resulting from causes not covered by the policy. Dennis v. Norwich Fire Ins. Soc'y, 50 Ohio App. 193, 197 N.E. 792 (1935). The policy involved in that case presented the same difficulties of proof as are contained in the policy under consideration here; namely, discriminating between damages caused by an insured event and a noninsured event, and showing the extent of loss resulting from the former. I cannot agree with the majority that the mere existence of such problems absolves a plaintiff from the duty of sustaining the otherwise applicable burden of proof.

For the foregoing reasons, a remittitur should be ordered in the amount of damages attributable to the inventory machinery, or if such amount cannot be computed with reasonable certainty, a new trial should be granted limited to the issue of damages.